## HAMILTON v. KENTUCKY & I. TERMINAL R. CO.

(Circuit Court of Appeals, Sixth Circuit. May 8, 1923.)

### No. 3821.

Internal revenue ⟜7—Payments made by railroad companies as joint owners of terminal bridge company held income, and terminal company one organized for profit.

Where a terminal company was organized by three railroad companies to acquire and jointly operate a bridge, the capital stock being owned by them in equal proportions, and the plan of organization reciting that the company was not to be operated for profit, but for the equal benefit of the railroad companies and for the purpose of securing terminal facilities, *held*, that payments by the owner railroad companies to the terminal company for their respective shares of the operating expense, including taxes and fixed charges, and the payment of interest on an outstanding mortgage bond indebtedness on the terminal company's properties, constituted income of the terminal company subject to tax, under Revenue Act Oct. 3, 1913, Act Sept. 8, 1916, § 10, and Act Oct. 3, 1917, § 4 (Comp. St. §§ 6336j, 6336jj), and that the company was one operated for profit, the payments of interest on the bonded indebtedness being a part of the rentals paid by the owner companies for their use of the terminal facilities, apportioned, as they were, to each owner according to its beneficial use of the terminal facilities, and this result is not affected by the fact that this was but a means of acquiring the ownership of the terminal properties; such payments being in reality earnings of the terminal company proceeding from the property and constituting a profit therefrom, notwithstanding that such profits were not to be transformed into dividends, but were ultimately to find their way into additions to and improvements and reconstruction of the property.

In Error to the District Court of the United States for the Western District of Kentucky; Walter Evans, Judge.

Action at law by the Kentucky & Indiana Terminal Railroad Company against Elwood Hamilton, late Collector of Internal Revenue, for the recovery of taxes. Judgment for plaintiff, and defendant brings error. Reversed and remanded.

S. Duffield Mitchell, Sp. Atty., for Bureau of Internal Revenue of Washington, D. C. (W. Sherman Ball, U. S. Atty., of Louisville, Ky., and Carl A. Mapes, Solicitor of Internal Revenue, of Washington, D. C., on the brief), for plaintiff in error.

Churchill Humphrey, of Louisville, Ky. (Humphrey, Crawford & Middleton, of Louisville, Ky., on the brief), for defendant in error.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

KNAPPEN, Circuit Judge. Defendant in error, which we shall call the Terminal Company, during the years 1915, 1916, and 1917,

owned and operated a bridge across the Ohio river for railroad, street car, wagon, and foot purposes, between Louisville, Ky., and New Albany, Ind. By section II A (1) of the Revenue Act of October 3, 1913 (38 Stat. .114, 166), the Terminal Company was liable to a tax of 1 per cent. upon its "entire net income arising or accruing from all sources" during the year 1915; by title 1, part II, § 10, of the Revenue Act of September 8, 1916, (39 Stat. 756, 765 [Comp. St. § 6336j]), it was liable to a tax of 2 per cent. upon such income during the year 1916; and by title I, § 4, of the Revenue Act of October 3, 1917 (40 Stat. 300, 302 [Comp. St. § 6336jj]), it was liable to a tax of 4 per cent. upon such income during the year 1917. Taxes assessed for each of the three years were paid under protest, and suit brought for their recovery. The only question presented is whether in that suit the District Court rightly rendered judgment for the Terminal Company, upon the ground that it had not, during any of the years in question, any taxable income whatever.

The Terminal Company was organized with a capital stock of $75,-000, held (except as to a few qualifying shares) in equal proportions by three railroad companies (the Southern, the Baltimore & Ohio Southwestern, and the Chicago, Indianapolis & Louisville), which acquired the terminal properties (as stated in the plan of reorganization) "for the equal benefit" of the three companies, and "not for the purpose of making any pecuniary profit from the undertaking," but "with the view to securing to these companies terminal facilities in the city of Louisville, and without any purpose of making the corporate organization a profitable one in the way of dividends upon any corporate stock to be issued by the new corporation." During the years in question the Terminal Company had an outstanding mortgage bond issue of more than $6,000,000, the payment of both principal and interest whereof was guaranteed by the three railroad companies to facilitate the sale. By contract between the Terminal Company and the three proprietary companies each of the latter was to have "full and equal rights with the others" in the terminal property; each agreeing for a period extending beyond the taxing years in question to make use of the Terminal Company's properties for all passenger and freight traffic within its control destined to cross the Ohio River at Louisville. Each proprietary railroad company was' to be charged the same amount for switching per car, but any deficit of the Terminal Company was to be "made up" by the three proprietary companies in proportion to each company's use of the terminal,[1] the Terminal Company being required to render monthly bills to the proprietary companies for switching charges, and also monthly bills to each showing amounts due by each company under the clause we have

---

[1] The contract provided that the proprietary companies "shall pay for the use of the property and facilities of the said Terminal Company such sums of money as shall from time to time be required, in addition to other revenues of the Terminal Company, to met all expenses of operation and maintenance of the property of the Terminal Company and all of its obligations for taxes and interest upon its first mortgage bonds as the same may be outstanding from time to time; the respective amounts to be paid by each company being fixed and determined" on a basis of usage of the terminal property.

quoted in the margin, each bill to include in its estimates one-twelfth part of the annual taxes and of the annual fixed charges.[2] Provision was also made for excluding any proprietary company which defaulted in payment of such bills from further use of the Terminal Company's property and from enjoyment of the terminal service. It was also provided that, until otherwise expressly agreed by the proprietary companies, no dividend from profits should be declared by the Terminal Company, but that "all surplus and net earnings and income shall constitute a reserve fund for additions to and improvements and reconstruction of the property of the terminal company."

If the payments so made by the proprietary companies are excluded from the Terminal Company's returns, that company not only had no income, but it suffered a substantial deficit during each of the years in question. If, however, the contributions by the proprietary companies constitute income, the Terminal Company had a substantial net income within the meaning of the statute for each of the three years. Due to the fact that while the proprietary companies paid the bond interest in full, the Terminal Company was entitled, in computing its net income, to deduct but a trifle more than one-half of the amount of the interest so paid. The Terminal Company raises no question of the validity of the income tax provisions so limiting interest deductions. See Anderson v. 42 Broadway Co., 239 U. S. 69, 36 Sup. Ct. 17, 60 L. Ed. 152. It results that, if the payment of the bond interest by the proprietary companies to the Terminal Company was income, the judgment below is concededly wrong, and should be reversed. The case thus turns solely upon the definition of income.

In Stratton's Independence v. Howbert, 231 U. S. 390, 415, 34 Sup. Ct. 136, 58 L. Ed. 285, income was defined as "the gain, derived from capital, from labor, or from both combined." In Doyle v. Mitchell, 247 U. S. 179, 38 Sup. Ct. 467, 62 L. Ed. 1054, this definition was approved when made to include profit gained through a sale or conversion of capital assets. In Eisner v. Macomber, 252 U. S. 189, 207, 40 Sup. Ct. 189, 64 L. Ed. 521, 9 A. L. R. 1570, and in United States v. Phellis, 257 U. S. 156, 168, 169, 42 Sup. Ct. 63, 66 L. Ed. 180 (both of which were stock-dividend cases), the definition above quoted was approved, being elaborated in statement (to use the language of the Phellis Case) as "a gain derived from capital, not a gain accruing to capital, nor a growth or increment of value in the investment, but a gain, a profit, something of exchangeable value, proceeding from the property, severed from capital, however invested, and coming in; that is, received or drawn by the claimant for his separate use, benefit and disposal." The Terminal Company invokes these definitions, and contends that the payments made by the proprietary companies are wholly excluded therefrom. In this connection it contends that its road was not operated for profit, and invokes the broad proposition that the income tax laws do not treat as income that which in the generally accepted sense is not income.

---

[2] During the year 1915 the proprietary companies, under the contract provisions referred to, paid $363,445.59; during 1916, the sum of $361,994.47; during 1917, the sum of $534,981.16.

We think these contentions overlook the substantial situation. The payments made by the proprietary companies were part of the rentals to be paid by those companies for their use of the terminal facilities. The Terminal Company had a substantial gross income apart from payments made by the proprietary companies. The latter needed the terminal facilities, and were willing to pay what those facilities were worth. They found it to their interest as stockholders to own equal interests in the stock, but as proprietary companies (as distinguished from their interests as stockholders) they saw fit to contract to pay to the Terminal Company, which owned and operated the physical properties, whatever amount was required above receipts from other sources to meet the expenses of operation, repairs, maintenance, and conservation of property, including interest upon the corporate indebtedness. These contributions were apportioned according to the beneficial use of the terminal facilities which each of the three proprietary companies enjoyed. These payments were nothing more or less than rentals of the terminal facilities. It could not well be doubted that, had they been beforehand fixed in amount, they would properly be treated as income. That these amounts were uncertain until fixed by experience does not alter their essential nature. Nor is it open to reasonable doubt that had the amount of these so-called deficiency payments been derived from rentals to other than the proprietary companies, they would have constituted income. Upon principle, we think these payments were true income, and they did not fail of being such from the fact that, as the only (at least the chosen) means of obtaining the Terminal Company's facilities, and the preferred rights thereunder, the proprietary companies were required to pay more for the facilities than perhaps could be obtained for casual or less complete or less important service. Nor, in our opinion, can it properly be said that the corporation was not organized for profit. The contract provision that, until otherwise expressly agreed by the proprietary companies, no dividend from profits should be declared, etc., does not preclude a change of policy in that regard.

Nor do we think that payments such as are here in question are outside the generally accepted definition of income. We think it clear that the payments so made by the proprietary companies as rentals did "proceed from the property" of the Terminal Company, were earnings of the latter's operation, and did constitute a profit therefrom (and equally whether or not there was a net gain or net income), notwithstanding, according to the then existing policy, such profits were not to be transformed into dividends, but were ultimately to find their way into "additions to and improvements and reconstruction of the property of the Terminal Company." The contemplated "reserve fund" to result from "surplus and net earnings and income" could be nothing else than profits. The fact that a net income, in a taxable sense, resulted only because the Terminal Company could not deduct from the rentals received all the interest paid, is unimportant, as has already appeared. That statutory "net income" was directly and immediately due to the interest payments made by the proprietary companies is not important. We are not impressed with the Terminal

Company's contentions that it acted only as distributing agent in the collection of the interest payments from the proprietary companies. The Terminal Company owned the terminal properties subject to the payment of the mortgages thereon. The interest money was thus paid to and used by the Terminal Company for meeting charges against its own property, default in whose payment might well result in the loss of the property. Had the interest payments been made by the proprietary companies directly to the bondholders or the mortgage trustee, the payments would have been none the less income of the Terminal Company. Anderson v. Morris, etc., Co. (C. C. A. 2) 216 Fed. 83, 90, 132 C. C. A. 327. It has been held that interest on bonds of a lessor company and dividends to stockholders of such company, paid as part of rentals by a lessee company, are "income" of the lessor company. Rensselaer, etc., Co. v. Irwin (C. C. A. 2) 249 Fed. 726, 161 C. C. A. 636; Northern Ry. Co. v. Lowe (C. C. A. 2) 250 Fed. 856, 163 C. C. A. 170. That dividends on stock paid by a lessee company directly to the lessor's stockholders, as part of an agreed rental, constitute "income" of the lessor corporation is held in West End Street Railway v. Malley (C. C. A. 1) 246 Fed. 625, 158 C. C. A. 581. Our conclusion, so far stated as on principle, that the proprietary companies' payments here involved are income within the taxing acts here in question, is fully supported by reasoned and convincing adjudications, which we are content to follow. Boston Terminal Co. v. Gill (C. C. A. 1) 246 Fed. 664, 158 C. C. A. 620; Houston Belt & Terminal Ry. Co. v. United States (C. C. A. 5) 250 Fed. 1, 162 C. C. A. 173. The Boston Terminal Case was in its facts almost identical with the instant case. The Houston Terminal Case directly involved, as did the Boston Terminal Case, the question of interest upon a terminal company's bonds. Every vital question here involved was presented and decided in one or both of these cases. The Terminal Company here makes no attempt to distinguish these cases from the instant case.

It results from these views that the judgment of the District Court should be reversed, and the cause remanded, with directions to take further proceedings not inconsistent with this opinion.

