Chenango Textile Corporation, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 104873.   Promulgated December 1, 1942.

*C. Addison Keeler, Esq.*, for the petitioner.
*Henry C. Clark, Esq.*, for the respondent.

OPINION.

TURNER, *Judge:* The petitioner contends that there was a forgiveness of indebtedness to it by Mrs. Till; that Mrs. Till was one of its stockholders; that the forgiveness of the indebtedness was gratuitous; and that under article 22 (a)–14 of Regulations 86, the gratuitous forgive-

ness of indebtedness to a corporation by one of its stockholders does not result in the realization of gain by the corporation. It relies on that sentence of the regulation reading as follows: "If a shareholder in a corporation which is indebted to him gratuitously forgives the debt, the transaction amounts to a contribution to the capital of the corporation."

It is the contention of the respondent that there was no gratuitous forgiveness of indebtedness and, the petitioner being solvent, there was realization of income through the cancellation or reduction of the indebtedness of petitioner to Mrs. Till.

In 1929 Mrs. Till, at the instigation of her son, who with Lynch constituted the executive committee of petitioner and managed and directed its affairs, sold certain securities to petitioner for an agreed price of $650,000. Her son and Lynch had represented to Mrs. Till that the transaction would operate to the advantage of petitioner, but there was no intention or thought that she should or was giving or donating anything to it. The price, according to the stipulation, was a fair price. The formal agreement executed approximately one week after delivery of the securities provided for payment of the agreed purchase price 20 years later and that Mrs. Till in the meantime should receive on the amount due interest at the rate of 5⅖ percent annually. She had up to the time of the sale been one of petitioner's first preferred stockholders and the rate of interest was designed to provide her with an annual income over the 20-year period of an amount slightly in excess of the amount she was then receiving on the stocks sold to the petitioner, including the 2,179 shares of petitioner's first preferred stock. Rather obviously it was through the agreement and the delayed payment of the purchase price of the securities in 1949 that petitioner was to benefit. The earnings from its silk manufacturing business had slumped considerably due to the advent of rayon, and Erhart Ruegg and Lynch had decided to launch petitioner into the buying and selling of stocks and securities. The securities acquired from Mrs. Till were to supply some of the immediate cash needed for that purpose. Accordingly, most of the securities, other than the shares of petitioner's first preferred stock, were sold within a period of seven months and the proceeds were used to pay the indebtedness owing on certain stocks which had been bought previously and in the purchase of additional stocks. Several years later some of the holders of the first preferred stock took the position that the transaction with Mrs. Till, through the agreement to pay to her annually as interest 5⅖ percent on $650,000 for a period of 20 years, was designed to and did place her in a position of preferment as to the earnings and distributions of the petitioner over all other preferred stockholders, contrary to the petitioner's articles of incorporation. A suit was filed by three preferred stockholders nam-

ing petitioner and Mrs. Till as defendants and alleging that the agreement in 1929 whereby Mrs. Till sold the various stocks to petitioner was *ultra vires* and illegal and in violation of petitioner's articles of incorporation. Among other things, it was pointed out that the articles prohibited the creation of any indebtedness by petitioner which was payable more than one year after date without the consent of three-fourths of the holders of the preferred stock outstanding. No such consent had been obtained at the time of the sale in 1929, nor until January 29, 1934, approximately three months before the filing of the suit by the preferred stockholders. In the meantime, on December 30, 1933, the preferred shares of the petitioner which had been acquired from Mrs. Till in the 1929 transaction had been returned to her and the $650,000 of indebtedness in her favor had been credited with an amount equal to the par value of the preferred stock so returned. These shares were obviously voted at the meeting of the preferred stockholders on January 29, 1934, which had approved the 1929 transaction between petitioner and Mrs. Till. In their suit the preferred stockholders asked that the contract of May 6, 1929, between petitioner and Mrs. Till be declared illegal, invalid, void, and of no effect, that Mrs. Till be ordered to return all moneys received, that the petitioner be required to present a full and complete account of its receipts and earnings and its indebtedness and disbursements over the period of years, and that the directors be perpetually enjoined from paying Mrs. Till anything further under the agreement.

In settlement of that suit Mrs. Till, petitioner, and the suing stockholders entered into an agreement the effect of which is in issue in this proceeding. A reading of the settlement agreement makes it at once apparent that the purpose sought to be accomplished, and in fact accomplished, was the complete cancellation of the agreement of May 6, 1929, and a return to Mrs. Till of all the securities received from her in 1929 or their equivalent in money as of the date of the settlement plus a further amount of $3,297.62 which, when added to the amount she had actually received as interest under the 1929 agreement, would equal the amount of dividends she would have received during the period from May 6, 1929, to the date of settlement had she continued to hold the stocks herself, the accrued but unpaid interest under the 1929 agreement being canceled along with the agreement itself. Mrs. Till had already had returned to her the 2,179 shares of petitioner's first preferred stock. All of the other stocks, except 100 shares of Union Pacific Railroad Co. stock and 20 shares of 6 percent preferred stock of the American Gas & Electric Co., had been sold by petitioner or liquidated. Instead of going on the market and buying similar shares to turn back to Mrs. Till, it was agreed that she should receive an amount approximating as nearly as practical the then current market price of the stocks in question, specified amounts being

designated as the amounts at which the shares of the corporations which had been liquidated should be carried into the transaction. This settlement agreement was carried out.

On such state of facts, we find nothing in the transaction to justify the conclusion that there was anything gratuitous about the settlement reached. In fact, the reasoning which would lead to a conclusion that there was a forgiveness of indebtedness to petitioner by Mrs. Till is not apparent. There was no claim or contention that the preferred stockholders who instituted the suit against petitioner and Mrs. Till did not do so in perfectly good faith, and certainly there was color to a number of their allegations, regardless of the fact that Mrs. Till, her son and Lynch might have thought and hoped that petitioner would be benefited through the use of the proceeds from the sale of Mrs. Till's securities in its stock dealing program. We do not need to conjecture on the outcome of the lawsuit if it had been litigated to a conclusion instead of being settled by an agreement of the parties. Obviously there was substantial consideration flowing from all parties and we are therefore concerned only with the settlement and its effect in the year 1935 for income tax purposes.

By that agreement the original transaction of 1929 was wiped out and canceled and a new transaction was substituted therefor. Such a transaction, standing alone, can not and does not result in the realization of gain by the acquiring party, whether it be said that the original sale price of the securities was scaled down to a lower level or the original agreement of sale was completely rescinded and a new one made in place thereof. *Borin Corporation* v. *Commissioner*, 117 Fed. (2d) 917, affirming 39 B. T. A. 712; *Pinkney Packing Co.*, 42 B. T. A. 823; *Hirsch* v. *Commissioner*, 115 Fed. (2d) 656; and *A. L. Killian Co.*, 44 B. T. A. 169; affd., 128 Fed. (2d) 433. If the securities which were not returned to Mrs. Till under the settlement agreement had not previously been sold, but had been sold in a later year and we had such later year before us, we would have here exactly the same situation as existed in *Borin Corporation* v. *Commissioner*, *supra*. The difficulty in this situation is that petitioner had sold the securities in question and had received and used the proceeds of sale in other dealings several years before the cost of the said securities to it had become finally fixed.

There can be no question that petitioner, by reason of the ultimate fixing of the purchase price of the said securities in 1935, benefited through actual realization in dollars by an amount equal to the difference between the purchase price of the securities and the amount at which they were sold. In the light, however, of the issues drawn in this case, two questions are presented, one, whether the amount by which petitioner benefited may be regarded as a

capital contribution by Mrs. Till, and the other, whether it must be treated as profit realized from the sale of securities at a price in excess of their cost. We have already demonstrated by a review of the facts that there was no gratuitous forgiveness of any such amount of indebtedness, on the part of Mrs. Till, and we are unable to find any other basis for concluding that a contribution to petitioner's capital was effected. Certainly there was nothing in the original transaction which indicated any thought or intention on the part of Mrs. Till or on the part of her son and Lynch that she should donate or contribute anything to the capital of petitioner corporation. She was simply selling securities to petitioner and the price it agreed to pay therefor was approximately that of the current market. Neither was there anything in the ultimate settlement agreement which indicated any contribution to petitioner by Mrs. Till. In the stockholders' suit it was claimed that the original agreement of sale was *ultra vires*, illegal, and void and that Mrs. Till was not entitled to the payment provided therein. By the settlement agreement the parties to the suit agreed that the original contract of sale should be canceled and of no effect and that the securities involved, or their equivalent in cash, should be returned to Mrs. Till. Regardless of her interest in the welfare of the petitioner corporation and her willingness to do whatever her son requested, Mrs. Till was settling a lawsuit and, in the light of what actually occurred, no one may properly say that she did not receive for herself everything to which she was rightfully and legally entitled. Certainly there is nothing in such an agreement that may be regarded as a contribution to anyone by any of the parties and it becomes at once apparent that if anything was realized by petitioner it was from the sale of the securities at an amount in excess of their cost and not by reason of any contribution on the part of Mrs. Till.

Our next query then is whether the ultimate fixing of the purchase price of the securities at an amount less than that at which they were sold, the sale having occurred in a prior year, brings the realization of gain therefrom into the year in which the price became fixed. Inasmuch as the cost of property is usually known and fixed before the sale and gain or loss is the difference between cost and the selling price, the realization normally occurs at the time of the sale. In some instances, however, the situation is in reverse in that the sale occurs and the terms thereof become fixed prior to the time when the buying price is known and determined, as in the case of short transactions on the securities exchange or the dealing in futures on the commodities exchange. In those instances the transactions become fixed and closed when the covering purchase is made, for at that time the cost becomes fixed and determined and it is known for the first time whether and what gain or loss results. We have a

rather comparable situation here. While the transaction here was not a short sale in one year with a covering purchase in a later year, the rescission or cancellation of the original agreement and the making of the new agreement which finally fixed and determined the purchase price presents a parallel situation and the gain measured by the difference between the selling price of the said stocks in the prior years and the ultimate purchase price could have been realized only when the purchase price was finally fixed. In other words, realization of the gain was the consequence of the lower and ultimate purchase price.

For the reasons stated, gain equal to the difference between the selling price of the securities and the cost as fixed and determined by the settlement agreement in 1935 constitutes taxable income in that year. *Carroll-McCreary Co.* v. *Commissioner*, 124 Fed. (2d) 303, is accordingly not in point. As we view it, that case deals with an entirely different situation. Cf. *Helvering* v. *Jane Holding Corporation*, 105 Fed. (2d) 993; cer. den. 310 U. S. 653.

At the time of the settlement agreement in 1935, interest in the amount of $66,258.40 which had been accrued for the years 1932, 1933, and 1934 under the agreement of May 6, 1929, remained unpaid and, along with that agreement, was canceled by the 1935 settlement. The said interest had been claimed as deductions on petitioner's income tax returns for the years in which it had accrued, but it had effected no offset against income by reason of the fact that petitioner's reported net loss for each such year substantially exceeded the deduction taken for accrued but unpaid interest. On such facts, cancellation of the interest in the taxable year did not result in the realization of taxable gain by petitioner. *Central Loan & Investment Co.*, 39 B. T. A. 981; *National Bank of Commerce of Seattle*, 40 B. T. A. 72; affd., 115 Fed. (2d) 875; *Estate of James N. Collins*, 46 B. T. A. 765.

The final issue involves the deductibility of attorney fees, and, of such fees deducted, only that paid to the petitioner's own counsel seems to us allowable. The fees paid for the account of the minority stockholders and of the petitioner's codefendant, however, do not appear to be the expenses of petitioner. As the petitioner concedes, "It is frankly not so clear that they are allowable as a deduction." Respondent is accordingly sustained as to all but $3,532.21 of the fees paid. *National Outdoor Advertising Bureau, Inc.* v. *Helvering*, 89 Fed. (2d) 878; *Kornhauser* v. *United States*, 276 U. S. 145; *Foss* v. *Commissioner*, 75 Fed. (2d) 326; *Blackwell Oil & Gas Co.* v. *Commissioner*, 60 Fed. (2d) 257.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

OPPER, *J.*, dissenting: It seems to me totally lacking in realism to conclude that this petitioner was in receipt of income of any kind by reason of the cancellation of the agreement obligating it to pay its preferred stockholder the originally agreed purchase price of the securities she had delivered. If this had been a transaction between strangers and the property remained in the vendee's possession, it might be permissible to regard the renegotiation as an adjustment of purchase price, even though that is not the theory upon which the proceeding was heard, nor the issue presented by the pleadings or arguments. See *Hirsch* v. *Commissioner* (C. C. A., 7th Cir.), 115 Fed. (2d) 656; cf. *Frank* v. *United States* (Dist. Ct., E. Dist. Pa.), 44 Fed. Supp. 729. But the difficulty with treating the income here as arising from the sale of the securities is that this was not a short sale nor a borrowing of securities nor anything of that nature and the property which petitioner originally sold was unquestionably its own and never considered nor treated otherwise. The cancellation of the note was not a true rescission, since the sale was in no respect any longer executory and it was impossible to restore the vendor to her original position. Furthermore, there was not, as in the case of a short sale, a covering purchase, or other similar dealing with the property in the tax year. Cf. *Estate of George H. Flinn*, 45 B. T. A. 874.

That, however, is a difficulty which does not seem to me to confront us, for the transaction was not between strangers but had its inception solely because of the stockholder-corporate relationship. The substance of it was that the stockholder loaned petitioner the money with which to buy her securities. This was done solely to benefit the corporation and she so testified. When this indebtedness was forgiven in the tax year before us it presented a familiar and usual situation. It need not be confused or complicated by considering the purchase and sale as the source of income, but can and it seems to me should be decided from the viewpoint of what it actually was—a gratuitous contribution to capital even though under some species of compulsion. This is a type of transaction specifically and satisfactorily disposed of by respondent's regulations which provide:

> * * * If a shareholder in a corporation which is indebted to him gratuitously forgives the debt, the transaction amounts to a contribution to the capital of the corporation. * * * Regulations 86, Art. 22(a)–14.

No consideration whatever flowed from the corporation to petitioner for her renunciation of the claim she held against it. Since the litigation instituted by the minority stockholders was for the corporation's benefit, it may justifiably be inferred that the settlement of the litigation with its accompanying cancellation of the debt resulted in an advantage to petitioner, but this does not prevent the act from being gratuitous, for, to borrow the language of *Carroll–*

*McCreary Co.* v. *Commissioner* (C. C. A., 2d Cir.), 124 Fed. (2d) 303, "such a construction of the regulation deprives it of any function whatever; for an indirect benefit of this character always results to the shareholder from a gift to his corporation." Cf. *Robert H. Scanlon*, 42 B. T. A. 997.

And to add that the stockholder received the further benefit of a settlement of the litigation is to say no more than that the minority stockholders were satisfied to discontinue that proceeding upon the indirect consideration of the benefit which the stockholder was conferring upon petitioner by canceling the obligation. The termination of the litigation was thus a consequence of the gratuitous contribution by the stockholder; it did not prevent that contribution from being gratuitous in the sense that the stockholder received nothing from petitioner in exchange. "In our opinion the phrase 'gratuitously forgives the debt' means simply that no consideration is paid by the corporation for release of the debt." *Carroll-McCreary Co.* v. *Commissioner, supra.* Nor is there anything to the contention that what the stockholder received was a prepayment and hence worth more than what she was entitled to a number of years later. The obligation was in default and under its terms payment could have been enforced at any time.

No support for the conclusion reached here is to be derived from such cases as *Helvering* v. *Jane Holding Corporation* (C.C.A., 8th Cir.), 109 Fed. (2d) 933, certiorari denied, 310 U. S. 653. Release of an indebtedness which has led in prior years to a tax benefit may well cause a subsequent readjustment to create taxable income on the familiar theory that recovery of items once deducted is the equivalent of the receipt of income. In that case the court was evidently influenced by this view, "the controlling factors being the previous deductions offsetting income otherwise taxable and the subsequent release of the indebtedness before payment." Under the facts we are considering here, in every year between the creation of the debt and its partial cancellation—except the year 1930 in which there were no security losses and the interest due was paid in cash—petitioner had a net loss without resorting to any deduction connected with the debt. Neither the capital losses attending disposition of the securities for which the debt was incurred nor the interest accrued in favor of the creditor was needed to compute its net loss in any year. *Citizens State Bank*, 46 B. T. A. 964. And see Revenue Act of 1942, sec. 116.

Finally, it seems inescapable that if the stockholder had made a cash contribution to the paid-in surplus of petitioner and petitioner had used those funds to pay off the obligation in full no material aspect of the entire situation would have been different. The litigation could clearly as well have been settled in that manner and the

minority stockholders would have been exactly as well off. But there would then have been no excuse for resorting to the short-sale concept upon which the decision here is rested nor any factual basis for it. The use of petitioner's outstanding obligation instead of cash to pay for such a capital contribution was merely a short cut to the same end and can not, it seems to me, justify the result reached. It is a familiar doctrine that the offsetting of an obligation has tax effects no different from what would be the case if one who was not a creditor attained a similar result by a cash outlay. See *Helvering* v. *Midland Mutual Life Insurance Co.*, 300 U. S. 216. That is the vital distinction from the cases relied upon in the prevailing opinion, none of which presented the stockholder-corporation relationship nor the problem of capital contribution.

I have no quarrel with the treatment accorded by the majority opinion to the forgiven interest or to the claimed deductions for attorney fees.

SMITH, and MELLOTT, *JJ.*, agree with the above.