BIRMINGHAM TERMINAL COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 27233.   Promulgated December 17, 1951.

*Charles M. Davison, Jr., Esq.,* for the petitioner.
*Stephen P. Cadden, Esq.,* for the respondent.

#### OPINION.

RAUM, *Judge:* Respondent determined deficiencies of $11,094.34 and $5,048.37, respectively, in petitioner's income and declared value excess-profits taxes for the calendar year 1945. Its returns for those taxes, reported on the accrual basis and for a calendar year period, were filed with the collector of internal revenue for the district of Maryland. The facts, completely stipulated by the parties, are not in dispute, and as stipulated are adopted as our findings of fact.

Petitioner is a corporation organized under Alabama law, and has its principal office in the District of Columbia. Its stock is owned entirely and equally by six railroads [1] (to which we also refer as "the roads") which operate passenger trains to and from the City of Birmingham, Alabama. Petitioner owns and maintains a passenger station, car sheds, tracks, yards, and appurtenant facilities in Birmingham which the roads use in common. Petitioner in effect is the vehicle through which the roads cooperate to provide and maintain for them-

---

[1] Southern Railway Company, Illinois Central Railroad Company, Seaboard Air Line Railway, Central of Georgia Railway Company, St. Louis and San Francisco Railroad Company, Alabama Great Southern Railroad Company.

selves necessary terminal facilities in that city. Petitioner's management is jointly designated and controlled by the roads, and the funds for petitioner's operations, with the exception of a relatively small amount of incidental income, are furnished by the roads.

The basis for this cooperative effort was laid in an agreement of 1907, not long after petitioner was organized, to which it and the roads were parties. Petitioner agreed to grant the roads use of its terminal facilities. The roads in turn agreed to pay an annual rental, in specified installments, equivalent to the sum of several items, the chief one being petitioner's net operating expense. The cost of operating the joint terminal facilities was, in other words, to be borne jointly by the roads in the form of a rental which, the agreement provided, was to be computed—

> By charging in the account on the one hand
>
> All items of expense by the Terminal Company which are usually and properly charged by railroad companies to operating expenses, including taxes, maintenance, insurance, renewals and depreciation of properties, as well as all extraordinary expenses which the Board of Directors of the Terminal Company may specially authorize and direct to be charged into such account, and
>
> By crediting in the account on the other hand
>
> All income derived by the Terminal Company from the rent of offices or privileges in or about the station building, or from any other source, including the rent paid by any other railroad company or companies which may be hereafter admitted to the use of said station and facilities by the Terminal Company.

In recording its expenses and income petitioner was subject to regulation by the Interstate Commerce Commission and kept its accounts in conformity with the Commission's requirements and prescribed classifications. Pursuant to the prescribed system, petitioner charged the expenses of operating and maintaining its terminal facilities to operating expense accounts, and apparently its incidental revenues were credited to revenue accounts. At the end of each month, the roads were charged with an amount equal to the charges entered in the expense accounts during the month, and were credited with the revenues entered during the same period. The roads paid petitioner the difference in their accounts between these charges and credits, so that petitioner ordinarily had no profit or loss, and on its income tax returns and in its annual reports to the Interstate Commerce Commission petitioner showed neither profit nor loss.

During the period from December 1926 to September 1940, and while this method of accounting was in effect, certain facilities used by petitioner in its terminal operations were withdrawn from service and retired as no longer useful in the business. The net costs of these retirements (to which we also refer as the "retirement losses") amounted to $50,092.18, and according to accounting requirements of the Interstate Commerce Commission, they could not be charged to its expense accounts. They therefore could not become charges

to the accounts of the roads, and no collection was made from the roads on account of the retirement losses, but instead they were carried as a loss in the profit and loss account.

In 1942 the Interstate Commerce Commission amended its accounting classifications to require, after January 1, 1943, that such retirement losses be charged to operating expenses rather than profit and loss, and in 1945 the Bureau of Accounts of the Commission directed petitioner to charge its operating expenses, and to credit its profit and loss account, in the amount of $50,092.18. The result was that in 1945, as part of the rental charge for using the terminal facilities and in accordance with the prescribed method of accounting, petitioner also charged this amount to the accounts of the roads.

For the years in which those retirements were made, petitioner's income tax returns did not show any net income. Only part of the retirement losses were actually deducted by petitioner on its returns; these produced no tax benefit, and petitioner would not have derived any tax benefit through deduction of the remainder of those losses. The credit of $50,092.18 made in its profit and loss account in 1945, was reported in its return for that year as nontaxable income. The roads, charged with that amount, accrued and deducted it on their returns for 1945 as operating expense.

The deficiencies in petitioner's taxes determined by respondent for 1945 depend on increase of petitioner's income on account of two items. One of these respondent now agrees was not income to petitioner in 1945. The second was the charge of $50,092.18 made by petitioner to the roads in connection with the retirement losses. Petitioner denies that this amount of $50,092.18 was taxable income. It relies on the so called tax benefit rule, and contends, since the retirement losses did not give rise to any tax benefits when they were incurred, it ought not be taxed on the reimbursement for those losses.

Petitioner's position, we think, is in accord with the settled course of decision, and must therefore prevail. *Dobson* v. *Commissioner*, 320 U. S. 489; *Boehm* v. *Commissioner* (C. A. 2), 146 F. 2d 553, 555–556, affirmed on another question, 326 U. S. 287; *Main Properties, Inc.*, 4 T. C. 364, 380; *Chenango Textile Corporation*, 1 T. C. 147, 160, affirmed in part and reversed in part on other grounds (C. A. 2), 148 F. 2d 296; *Barnhart-Morrow Consolidated*, 47 B. T. A. 590, 600–601, affirmed on other questions (C. A. 9), 150 F. 2d 285; *Amsco-Wire Products Corporation*, 44 B. T. A. 717; *National Bank of Commerce of Seattle*, 40 B. T. A. 72, 75, affd. (C. A. 9), 115 F. 2d 875; *Central Loan & Investment Co.*, 39 B. T. A. 981. Petitioner had no net income against which to offset the retirement losses when they occurred, and it can make no difference in the application of the principle recognized in these cases that it did not actually deduct all those losses in the

earlier years, since it was entitled to take the deduction but would have derived no advantage had it done so. Cf. *Boehm* v. *Commissioner, supra.* But cf. *Mathey* v. *Commissioner* (C. A. 1), 177 F. 2d 259, 264. To be sure, section 22 (b) (12) of the Internal Revenue Code,[2] which was intended to achieve a like result in certain circumstances, is literally not applicable here, but it was made plain in *Dobson* v. *Commissioner*, 320 U. S. at 505–506, that the addition of these provisions to the Code did not preclude the application of a similar rule in other comparable cases.

The only argument respondent makes for a contrary result is rather formal and may be put as follows: the roads, in their agreement of 1907 with petitioner, undertook explicitly to pay "rent" and the sum of $50,092.18 was charged against them as part of their "rent"; rent constitutes income; therefore that sum must be reported as income. We say this is a formal argument because it is founded on the nominal designation of "rent" in the agreement.

Undeniably, the payments and charges undertaken by the roads for the use of the terminal facilities were governed by the 1907 agreement, and this agreement clearly treats such payments and charges, including the charge of $50,092.18, as "rent." It is just as clear, however, that this "rent" was of a dual character, and, particularly with respect to the $50,092.18, was as well a reimbursement for loss or expense incurred on the terminal operation. Because of the relationship between petitioner and the roads, the latter in effect underwrote the former's

---

[2] SEC. 22. GROSS INCOME.

\* \* \* \* \* \* \*

(b) EXCLUSIONS FROM GROSS INCOME.—The following items shall not be included in gross income and shall be exempt from taxation under this chapter:

\* \* \* \* \* \* \*

(12) RECOVERY OF BAD DEBTS, PRIOR TAXES, AND DELINQUENCY AMOUNTS.—Income attributable to the recovery during the taxable year of a bad debt, prior tax, or delinquency amount, to the extent of the amount of the recovery exclusion with respect to such debt, tax, or amount. For the purposes of this paragraph:

(A) Definition of Bad Debt.—The term "bad debt" means a debt on account of worthlessness or partial worthlessness of which a deduction was allowed for a prior taxable year.

(B). Definition of Prior Tax.—The term "prior tax"" means a tax on account of which a deduction or credit was allowed for a prior taxable year.

(C) Definition of Delinquency Amount.—The term "delinquency amount" means an amount paid or accrued on account of which a deduction or credit was allowed for a prior taxable year and which is attributable to failure to file return with respect to a tax, or pay a tax, within the time required by the law under which the tax is imposed, or to failure to file return with respect to a tax or pay a tax.

(D). Definition of Recovery Exclusion.—The term "recovery exclusion," with respect to a bad debt, prior tax, or delinquency amount, means the amount, determined in accordance with regulations prescribed by the Commissioner with the approval of the Secretary, of the deductions or credits allowed, on account of such bad debt, prior tax, or delinquency amount, which did not result in a reduction of the taxpayer's tax under this chapter (not including the tax under section 102) or corresponding provisions of prior revenue laws, reduced by the amount excludible in previous taxable years with respect to such debt, tax, or amount under this paragraph.

\* \* \* \* \* \* \*

operating expenses, and although their agreement spoke in terms of "rent," it was in essence an agreement by the roads to furnish the funds necessary to make available terminal facilities. The very method provided in that argreement for calculating the "rent" expressly made it depend on the net expense in operating these facilities, and obligated the roads, within the limits permitted by the Interstate Commerce Commission, to make petitioner whole for its losses in maintaining and operating the terminal facilities. It is beyond the slightest doubt that the $50,092.18 charge was made in fulfillment of this obligation, and to reimburse petitioner for the retirement losses incurred in connection with those facilities.

Where, as here, there is an accrual or receipt in reimbursement of a loss or expense, we see no reason to bar application of the principle approved in the foregoing cases just because the reimbursement or recovery is made in the form of "rent." We may assume that ordinarily rent payable by railroads to a terminal company is taxable income to the latter (*Hamilton* v. *Kentucky & Indiana Terminal R. Co.* (C. A. 6) 289 F. 20, just as the taxpayer in the *Dobson* case would ordinarily have to include his receipt in taxable income (cf. *Harbor Building Trust*, 16 T. C. 1321, 1333–1334). The point is that what might otherwise be includible in taxable income ceases to be so because of a train of events which bring into play the so called tax benefit principle, as recognized and applied by the courts.

*Decision will be entered for the petitioner.*