LEE R. CHRONISTER and ROBERTA L. CHRONISTER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Chronister v. Commissioner
Docket No. 8705-71.
United States Tax Court
T.C. Memo 1973-237; 1973 Tax Ct. Memo LEXIS 49; 32 T.C.M. (CCH) 1108; T.C.M. (RIA) 73237; October 25, 1973, Filed Lee R. Chronister, pro se. Richard J. Shipley, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioners' income tax for the calendar year 1968 in the amount of $2,751.08. The issue for decision is to what extent, if any, a payment of $19,384.65 made by the Alaska Mortgage Adjustment Agency to the Small Business Administration on behalf of petitioners in reduction of their home mortgage constitutes gross income to petitioners as a recovery for a previously deducted earthquake casualty loss. 2 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, whose legal residence at the time the petition in this case was filed was Anchorage, Alaska, filed a joint Federal income tax return for the calendar year 1968 with the district director of internal revenue, Anchorage, Alaska. On March 27, 1964, a severe eathquake, commonly *52 referred to as the "Good Friday" earthquake, occurred over a large part of Alaska. The earthquake caused substantial damage to petitioners' personal residence which was located in Anchorage, Alaska. Petitioners moved out of their home immediately after the earthquake until repairs could be made. Because of the extensive repairs which would be needed in order to make petitioners' home habitable, petitioners estimated that the value of the house immediately after the earthquake and prior to making any repairs was approximately $10,000. Subsequently, with funds received from a loan, as hereinafter outlined, petitioners made the repairs which were essential to enable them to move back into the house and have continued to make repairs 3 to the house since 1964. At the time of the trial of this case, there remained to be made certain repairs necessary to put petitioners' property back into a condition comparable to the condition it was in prior to the earthquake. Petitioners purchased their personal residence in 1963 at a cost of $41,900. They had made a $6,500 downpayment on the home at the time it was purchased and placed a first and a second mortgage on the home to cover the *53 balance of the purchase price and some incidental expenses. Petitioners made some payments on the first and second mortgages and at the date of the earthquake the total amount due by petitioners on these two mortgages plus accrued interest was $35,416.62. In November 1964 petitioners obtained a loan from the Small Business Administration in the amount of $47,100 which they used to satisfy the existing mortgages on their home and spent the balance for repairs to their house. On August 19, 1964, Congress amended the Alaska Omnibus Act by Pub. L. 88-451, 78 Stat. 505, to provide assistance to the State for the reconstruction of the areas damaged by the earthquake. Section 57 of 4 Pub. L. 88-451 contained provisions authorizing grants for the purpose of enabling the State of Alaska to retire or adjust outstanding home mortgage obligations on one to four family homes which were severely damaged or destroyed in the "Good Friday" earthquake. On September 7, 1964, a special session of the Alaskan legislature enacted legislation to implement section 57 of the Alaska Omnibus Act (Chapter 1, SLA 1964, First Special Session). This legislation authorized the governor of the State *54 of Alaska to establish an Alaska Mortgage Adjustment Plan for the implementation of section 57 of the Alaska Omnibus Act. Under the plan which was approved on behalf of the President of the United States on February 18, 1965, the Commissioner of Commerce of the State of Alaska was to administer the program through an agency entitled the "Alaska Mortgage Adjustment Agency." Petitioners made application to the Alaska Mortgage Adjustment Agency for relief and during 1968 that agency made a payment of $19,384.65 to the Small Business Administration to be applied in reduction of petitioners' home mortgage loans. The payment was made on petitioners' behalf because of the damage sustained by petitioners' residence during the 5 "Good Friday" earthquake and was applied by the Small Business Administration in accordance with the requirement of the State and Federal law to reduce the mortgages encumbering petitioners' property. Since the reduction of their mortgage by the payment made on their behalf by the Alaska Mortgage Adjustment Agency, petitioners have been able to and have borrowed additional sums to make further repairs to their home. In 1970 they borrowed $2,500 from the First *55 National Bank of Alaska which they used to relevel their house. Since the earthquake petitioners have had continuing problems with the house due to settling and cracking and have claimed additional casualty losses or damages from these causes on certain of their Federal income tax returns for years subsequent to 1964. Section 190 of the regulations issued by the Alaska Mortgage Adjustment Agency provided as follows: Procedures and Criteria for determining fair market value The Agency shall determine, subject to review by the Commissioner on appeal as provided in Part XI of the Plan, pre-earthquake fair market value on the basis defined in item 9, Section 250 of these regulations, and shall compute the post earthquake value in the manner indicated by Sections 160 and 185 of these regulations. The Agency shall require such appraisals, 6 surveys, estimates, sworn statements, and other information to be furnished, in addition to the items specifically mentioned in the Plan, Supplemental Application, and these regulations, as the Agency deems appropriate to establish an adequate basis *56 for the exercise of its judgment in the circumstances of each case. Item 9 of section 250 of these regulations provided as follows: 9. "Fair market value" means the amount that could reasonably be expected to be realized by a willing seller, under no extraordinary pressure or compulsion to sell, on a sale to a willing buyer under no extraordinary pressure or compulsion to buy. Section 160 of these regulations defined eligible costs of restoration as follows: (a) Eligible costs of restoration shall include the estimated or actual contractual costs of: 1. repairs or replacements to improvements on properties described in Section 130 of these regulations, needed to restore them to substantially the same usefulness and appearance as immediately before the earthquake; and 2. grading or other work to the lot itself, needed for continued occupancy and use of the property. (b) Where the improvements have been or will be moved to a different lot, costs under Section . 160(a) 2. of these *57 regulations, shall include the value of the new lot minus the value, if any, of the old lot, plus moving costs. 7 (c) Where damage to the lot itself, or to the surrounding area, including underlying ground layers, is so extensive that further residential use of the lot is prohibited under State or local law or regulations, and the improvements are not to be moved to a different lot, the property shall be considered to be totally destroyed, and the cost of restoration shall be considered to be equal to the value of the property immediately before the earthquake. Section 185 of the regulations provided the method of determining the payments to be made by the Alaska Mortgage Adjustment Agency. Applying these criteria, the amount which was paid for petitioners was computed as follows: 1. Pre-earthquake fair market value
$37,000.00
2. Physical damage (cost of restoration)
25,500.00
3. Computed post-earthquake value (line 1 minus line 2)
11,500.00
4. March 27, 1964, aggregate outstanding amounts of purchase money and improvements lien obligations.
Philadelphia Savings Fund Soc.
$28,424.78
5 3/4% interest 3-1-64 to 3-28-64
122.58
H. Henry & Barbara N. Roloff 6% interest 3-12-64 to 3-28-64
18.27
Total
$35,416.62
Less: Roloff-reduced contract balance any discounts at which lienors acquired the obligations
3,503.97
5. Aggregate outstanding obligations
$31,912.65
6. Adjusted outstanding obligations
$31,912.65
7. Amount by which March 27, 1964 obligations are eligible for reduction (Line 6 minus Line 3)
$20,412.65
8. Amount of principal required to be paid by or for lien debtor subsequent to March 27, 1964
1,000.00
(a) Amount paid to principal since March 27, 1964
$ 4,961.44
(b) Excess (over $1,000) to be credited by lienor in further reduction of indebtedness (8(a) minus 8)
3,961.44
9. Amount to be paid by Agency (Line 7 minus Line 8, but not to exceed $30,000)
$19,412.65
10. Amount by which each obligation is to be reduced by Agency payment in accordance with priorities under Alaska law
Small Business Administration
$19,384.65
Alaska Title Guaranty Co.
28.00
TOTAL
$19,412.65
*58 Petitioners had filed their original return for the calendar year 1963 prior to the "Good Friday" earthquake. On this return they had shown total salary and wages of $14,586.02, which they reduced by a loss computed on a rental of part of the building in which they had lived prior to the purchase of the home which was damaged by the earthquake at $788.80, leaving total income of $13,797.22. They claimed total deductions of $4,558.72 which, excepting $90 of Union dues, consisted of contributions; interest paid on their home mortgages, 9 to a credit union, to various stores, and to General Motors Acceptance Corporation; real estate, sales, State income taxes and personal property taxes; and medical and dental expense deductions. The State income taxes were shown at $407.71. After subtracting these claimed deductions petitioners showed income of $9,238.50, claimed five personal exemptions totaling $3,000 and showed taxable income of $6,238.50 with a tax due of $1,292.53. After the earthquake, petitioners heard various radio announcements stating that the Internal Revenue Service's assistance programs had individuals available to help persons who had sustained losses in the *59 "Good Friday" earthquake properly fill out their income tax returns for the year 1963. Petitioners consulted with one of the persons assigned to this tax assistance program in the office of the district director of internal revenue and as a result of this consultation, on April 12, 1964, filed a form 1040, U.S. Individual Income Tax Return, entitled 10 "Amended Tax Return Casualty - Earthquake." [1] On this return the same income was reported and deductions and exemptions claimed as were claimed on the first tax return filed by petitioners for the calendar year 1963, except that petitioners claimed a loss of property by earthquake of $6,500. Petitioners 11 attached to their return the following explanation of this claimed loss: We previously submitted a return with refund due of $606.64 which should be subtracted from the amount claimed on this return. 1. Value of Home before disaster
$41,900
2. Value of Property after disaster
-10,000
(Would have to be moved to new lot and new basement and utilities constructed at cost of $12,000)
3. Decrease in value of property
31,900
4. Adjusted basis of property
31,900
5. Loss sustained on property
31,900
6. Estimated insurance recovery
None
7. Value of furnishings before disaster
8,000
8. Value of furnishings after disaster
approx. 4,000
9. Decrease in value of furnishings
approx. 4,000
10. Less insurance recovery
None
11. Casualty loss on furnishings
approx. 4,000
Loss on both home & furnishings
approx. 35,900
*60 Note: It would be ridiculous to claim such a loss, as we could not possibly pay such a figure. I claimed only loss of down payment. Will claim additional loss in future year IF and WHEN we pay it. *61 Petitioners on their Federal income tax return for the calendar year 1964 reported income of $13,170.70 and deductions of $24,943.35, of which $21,100 consisted of claimed damage to home by earthquake of $19,900 and damage to furnishing of $1,200. Based on this claim petitioners showed no tax due for the year 1964. 12 Attached to their return for the calendar year 1964 petitioners had the following explanation: In September of 1963, we contracted to buy a house at $41,900…in March of 1964, it sustained $15,000 damage to the house…the soil of the lot compacted and dropped a foot so the house is now valued at $31,000. On the amended return submitted last year, I claimed $6,000 and no more (I don't know how I arrived at this figure, since we paid approximately $7,000 down). I couldn't conceive of obtaining a loan to repair the house. Nevertheless, we did obtain a loan of $15,000, which we have begun repaying. We also lost approximately $1,200.00 of our furnishings. Petitioners' 1963 and 1964 income tax returns were examined by respondent, and respondent determined the total amount of their casualty loss to be $22,050. Respondent further determined that the entire *62 amount of the casualty loss was allowable in 1963 because petitioners had made a valid election to claim the loss in that year. As a result of carrying back the unused 1963 loss, respondent allowed a refund of $1,365.76 to petitioners for taxes paid for the year 1960. [2] 13 Petitioners on their Federal income tax return for the calendar year 1968 included no amount of the payment made on their behalf by the Alaska Mortgage Adjustment Agency in their income. They attached the following explanation: Form 1099 Received From State of Alaska Mortgage Adjustment Agency as relief from earthquake of March 27, 1964. Casualty loss was allowed by IRS only to extent of cost of repair. No tax benefit received. Respondent in his notice of deficiency increased petitioners' income as reported for the calendar year 1968 by $10,236.37 with the following explanation: *63 It is determined that the amount of $19,384.65 paid to Small Business Administration on your behalf by the State of Alaska Mortgage Adjustment Agency constitutes gross income to the extent that such payment exceeds the recovery exclusion provided by Section 111 of the Internal Revenue Code. It is further determined that the recovery exclusion computed with respect to each payment was $10,236.37. Taxable income is accordingly increased by $10,236.37. OPINION Respondent in his brief takes the position that the mortgage adjustment payment made on petitioners' behalf in 1968 constitutes "compensation" for the casualty loss sustained by petitioners on their house from the "Good Friday" earthquake within the meaning 14 section 165(a), I.R.C. 1954. [3] Respondent then states that because this amount constitutes compensation for a casualty loss deductible under sections 165(c) and 165(h), the payment by the Alaska Mortgage Adjustment Agency constitutes income to petitioners to the extent determined in his notice of deficiency under the provisions of section 1.165-1(d) (2) (iii), Income Tax Regs.[4]
*64 Respondent argues that the payment on petitioners' behalf by the Alaska Mortgage Adjustment Agency was not a gift and was in fact to compensate petitioners for eathquake damage to their home. We need not discuss further in this case this argument of respondent since petitioners point out in thier brief and stated at the trial that they recognize that the payment by 15 the Alaska Mortgage Adjustment Agency on their behalf was to compensate them for their casualty loss and they concede that this payment would properly be income to the extent that it exceeds the portion of their properly deductible casualty loss for which they received no tax benefit. It is petitioners' position that they were entitled to deduct a casualty loss because of the "Good Friday" earthquake of not less than $30,000, but that they received a tax benefit for less than $10,000 of this properly deductible casualty loss. Petitioners contend that their properly deductible casualty loss exceeded the amount of the $19,384.65 payment made on their behalf by the Alaska Mortgage Adjustment Agency by more than the $10,000 for which they received a tax benefit. Respondent's only answer to this argument of petitioners *65 is to state that the amount of the casualty loss deduction is pertinent only for the purpose of computing the recovery exclusion under section 111 and that this Court has previously held that it is not permissible to reopen the year of the previous deduction in order to claim additional deductions or to make 16 corrections. First National Bank, 22 T.C. 209 (1954), aff'd. 221 F.2d 959 (C.A. 2, 1955), certiorari denied 350 U.S. 887 (1955). Section 111 provides "Gross income does not include income attributable to the recovery during the taxable year of a bad debt, prior tax, or delinquency amount, to the extent of the amount of the recovery exclusion with respect to such debt, tax, or amount." Section 1.111-1(a), Income Tax Regs., provides, in part: The rule of exclusion so prescribed by statute applies equally with respect to all other losses, expenditures and accruals made the basis of deductions from gross income for prior taxable years, * * * Section 111(b) (4) defines recovery exclusion as the amount of deductions *66 "* * * allowed, on account of such bad debt, prior tax, or delinquency amount, which did not result in a reduction of the taxpayer's tax * **." Respondent in his determination as set forth in his notice of deficiency apparently computed the recovery exclusion at $10,236.37 and considered this amount to be taxable to petitioners instead of considering the amount of the recovery in excess of the recovery exclusion to be the amount taxable to petitioners. One of petitioners testified that petitioners received 17 a tax benefit on less than $10,000 of the amount they claimed as a deduction for their casualty loss. Therefore, apparently a proper computation of the amount includable in petitioners' income for the taxable year 1968, even under respondent's theory of the amount of "recovery exclusion" to which petitioners are entitled, would be the difference between the payment of $19,384.65 made on petitioners' behalf in 1968 and the amount of the recovery exclusion of $10,236.37. Petitioners, however, contend that respondent incorrectly limited the amount of their casualty loss to $22,050 in determining the excess of their casualty loss over the amount for which they received a *67 tax benefit. We do not agree with respondent that the First National Bank case supports his position that petitioner is bound by the amount of $22,050 as the amount of deduction for their casualty loss. In that case the taxpayer had reported a loss on its corporate return for the year 1937 after having claimed deduction of $58,933.17 for bad debts on various notes and bonds. The Commissioner made no changes in the income, deductions, or tax of the taxpayer for the year 1937. In 1949, the taxpayer recovered a portion of the bad 18 debt that had been charged off in 1937. Respondent determined that the total amount of the recovery was taxable. In years prior to 1949 the taxpayer had made bad debt recoveries for the debts charged off in 1937 in excess of the loss claimed on its 1937 return. The taxpayer claimed that it had other deductions for the year 1937 which it could have claimed but did not since without claiming such deduction it had a net loss. The taxpayer wanted to relitigate the year 1937 and have this Court determine what the proper income for that year would be prior to the deduction of its bad debts. We held in the First National Bank case that the provisions of *68 section 22(b) (12) (D), I.R.C. 1939, which are substantially similar to the provisions of section 111 of the 1954 Code, did not authorize relitigating the year in which the deduction on which a recovery was made had been claimed. In that case the taxpayer was contending that it had unclaimed 1937 deductions unrelated to the deduction of which a recovery was made which would decrease the net income prior to that deduction, thereby increasing the amount of the recovery exclusion. Petitioners in the instant case claimed on their returns in the two years 1963 and 1964 total deductions 19 for a casualty loss of $27,600, and in our view actually claimed a loss of at least $31,900 since apparently they would, in accordance with the statement made in their return for 1963, have continued in years subsequent to 1964 to claim the balance of what they considered to be their casualty loss to the extent needed to offset their income. However, when respondent determined that petitioners, having made an election to claim the deduction in 1963, were required to first carry the deduction back to years prior to 1963, apparently the amount of the loss became academic since petitioners had paid *69 little tax in these prior years. [5] One of petitioners testified: In 1965, January, we returned to taxpayer assistance and asked for help in preparing our tax return. At that time, they permitted us to claim only part of the loss, $22,050. That was set by the IRS after our inspection. We were also told the loss 20 would have to be claimed in 1963 and carried back five years. 1963 was a year of low income, and 1962 and 1961 were years of almost no income, because we were in business for ourself, and we lost our shirts, so to speak. Therefore, not only did the IRS not permit us to claim the full amount of the loan [sic (apparently should be loss)], which was at least $10,000 greater as in the figure set by the IRS, but they instructed us to elect the loss in a low income year and carry it back to the years of no income. This resulted in our receiving a disasters tax refund in the amount of $1,365.76, a tax benefit on our loss of less than 10,000. * * * As we received no tax benefits on approximately $20,000 to the original $30,000 character [sic (apparently should be casualty)] loss * * * [it] is logical for the IRS to contend this $19,384.65 as income and propose *70 a tax deficiency of $2700. We pointed out that IRS figures showed that the mortgage adjustment relieved us of our entire loss only because we were originally prevented from claiming the full loss. At this time, IRS figured our disaster tax refunded in 1964. They contended since we had no - had not paid a large amount of taxes in 1963 and prior years, that we could not expect a large refund. They said that our actual loss amount was immaterial, that the figures they imposed, $22,050, was large enough to give us the tax refund we could expect in ratio to the taxes we had paid. We must therefore decide the amount *71 of casualty loss to be used in determining the exclusion from petitioners' gross income for the year 1968 because of petitioners not receiving a tax benefit from the deduction. Dobson v. Commissioner, 320 U.S. 489 (1943). 21 The record is clear that petitioners had no recovery of any of their casualty loss in any year prior to 1968. The import of a number of our cases is that section 111 defining the term "recovery exclusion" does not limit the application of the tax benefit rule which was recognized by case law prior to the enactment into the Revenue laws of the provisions now contained in section 111. In Home Savings & Loan Co., 39 T.C. 368 (1962), we held that a rebate received by a taxpayer of State property tax paid in prior years when it had been exempt from Federal income tax was not includable in its income. We pointed out that the entire amount of this refund of State tax exceeded the amount of a deduction or credit which had been allowed for prior taxable years since the taxpayer had not been subject to income tax for prior taxable years. In *72 so holding we stated (39 T.C. at 369-370): He [respondent] determined the $59,114.98 to be an item of income to petitioner in 1956, grounding his argument on the broad general proposition that section 61(a) of the Internal Revenue Code of 1954 requires the inclusion in income of all items of income except those specifically excluded. Respondent points out that the sum in question does not fall within the exclusion provided by section 111 of the 1954 Code 22 for the recovery of "prior taxes." [footnote omitted] While we are inclined to agree, we find it unnecessary to pass upon this issue since we think petitioner falls squarely within the broader, more general rule relating to tax benefits which we have said is not limited by the provisions of section 111. Birmingham Terminal Co., 17 T.C. 1011 (1951). Relying on this rule, petitioner contends that since the payment of the State taxes in question did not give rise to any tax benefit when they were paid, it ought not be taxed on the recovery of those taxes. We agree. It our view that *73 one does not ordinarily acquire taxable income by a refund of taxes which he should never have had to pay. However, where the taxpayer has used the taxes paid to gain a tax deduction, the later recovery of such taxes is "for tax purposes, like a windfall and within the broad definition of taxable income." Perry v. United States, 160 F. Supp. 270 (Ct. Cl. 1958).In the instant case petitioner did not deduct, nor in fact could it have deducted, the payment of State taxes during the years of its exemption. Yet it can make no difference in the application of the principle recognized in the Dobson case that petitioner did not actually deduct these taxes in the earlier years, as is contended by respondent. Cf. Birmingham Terminal Co., supra. In Birmingham Terminal Co., 17 T.C. 1011, 1013 (1951), referred to in the Home Savings and Loan case, respondent was contending that when the taxpayer received reimbursement by a railroad on account of retirement losses, which because of Interstate Commerce 23 Commission regulations it could not charge against the railroad using its facilities in prior years, it had received taxable income. In holding *74 that this was not the fact, we pointed out that for the years in which the retirements were made the taxpayer's income tax returns did not show any income, that only part of the retirement losses were actually deducted by the taxpayer on its returns, that these produced no tax benefit and that the taxpayer would not have derived any tax benefit through any deduction of the remainder of the losses. We held that since the taxpayer would have received any tax benefits had it deducted all the not losses that it properly could have deducted, it received no income when it was reimbursed for those losses. In so holding we stated: Petitioner had no net income against which to offset the retirement losses when they occurred, and it can make no difference in the application of the principle recognized in these cases that it did not actually deduct all those losses in the earlier years, since it was entitled to take the deduction but would have derived no advantage had it done so. Again, in Louise Webber O'Brien, 22 T.C. 661 (1954), we refused to adopt the restrictive view contended for by respondent in determining the application of the tax benefit rule. In accordance with *75 the holdings 24 in these cases, we conclude that petitioners are correct in their position that in determining the extent to which, if any, the $19,384.65 amount paid on behalf of petitioners primarily to the Small Business Administration is taxable to them in 1968, we must start with a deduction of a proper amount of loss for the casualty sustained by petitioners in the 1964 "Good Friday" earthquake and then subtract the casualty loss for which petitioners received a tax benefit from the amount of the casualty loss sustained by petitioners. If the remainder exceeds the $19,384.65 recovery, no amount of the recovery is taxable to petitioners in 1968. If it does not, the excess of the $19,384.65 recovery over the portion of the casualty loss for which petitioners received no tax benefit is taxable income to petitioners in 1968. In our view petitioners originally claimed a casualty loss of at least $31,900. However, considering all the testimony in the record we have concluded that petitioners actually suffered a casualty loss in the "Good Friday" earthquake in the amount of $30,000 as they now claim. In reaching this conclusion we have considered not only petitioners' testimony, *76 25 but also the testimony of the director of the Alaska Mortgage Adjustment Agency as to how that Agency determined the payments to be made on mortgages during the year 1968 when it made the payment on behalf of petitioners. We recognize that petitioners did not pursue in a court proceeding the correctness of respondent's determination that they were entitled to only $22,050 as a casualty loss instead of the greater amount which they had claimed. However, apparently, if they accepted respondent's determination that they were bound by their election to claim the loss in 1963, they would have had no standing to contest his determination of the amount of the loss at that time since their taxes would not have been lessened by a greater loss. In our view, therefore, the deduction for the casualty loss to be used in determining whether petitioners are taxable on any portion of the $19,384.65 paid on their behalf by the Alaska Mortgage Adjustment Agency in 1968 is $30,000. Decision will be entered under Rule 50. Footnotes
1. Sec. 165(h), I.R.C. 1954, as applicable in the year 1964, provided as follows: (h) Disaster Losses. - Notwithstanding the provisions of subsection (a), any loss (1) attributable to a disaster which occurs during the period following the close of the taxable year and on or before the time prescribed by law for filing the income tax return for the taxable year (determined without regard to any extension of time), and (2) occurring in an area subsequently determined by the President of the United States to warrant assistance by the Federal Government under sections 1855-1855g of title 42, at the election of the taxpayer, may be deducted for the taxable year immediately preceding the taxable year in which the disaster occurred. Such deduction shall not be in excess of so much of the loss as would have been deductible in the taxable year in which the casualty occurred. If an election is made under this subsection, the casualty resulting in the loss will be deemed to have occurred in the taxable year for which the deduction is claimed. The President of the United States determined Alaska to be a disaster area because of the earthquake of March 27, 1964. See Rev. Rul. 64-332, 1964-2 C.B. 59↩. 2. The stipulation reads "an assessment of $1,365.76 was allowed for 1960." One of the petitioners testified that petitioners received "a disaster tax refund in the amount of $1,365.76" as a result of carrying back a loss to years prior to 1963, so we conclude that petitioners received a refund in this amount for 1960. ↩
3. All references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. ↩
4. Sec. 1.165-1(d) (2) (iii), Income Tax Regs., provides as follows: (iii) If the taxpayer deducted a loss in accordance with the provisions of this paragraph and in a subsequent taxable year receives reimbursement for such loss, he does not recompute the tax for the taxable year in which the deduction was taken but includes the amount of such reimbursement in his gross income for the taxable year in which received, subject to the provisions of section 111↩, relating to recovery of amounts previously deducted. 5. The evidence is not in the record to show why on a carryback petitioners could absorb a loss of $22,050 and, apparently if petitioner's testimony is accurate, even an additional $10,000 without having available any carryover to 1964. However, it is obvious from the provisions of sections 172(c) and (d) which provide for the computation of net operating losses and section 172(b) (2) which provides for the carryback and carryover of net operating losses, that this could be the situation. In any event, this is a matter which can be resolved in a Rule 50 computation. ↩