**HOME MUTUAL INSURANCE COMPANY, Petitioner-Appellee, Cross Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellant, Cross Appellee.**

Nos. 79–1602, 79–1603.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 24, 1979.

Decided April 29, 1980.

Argued En Banc Nov. 13, 1980.

Opinion on Rehearing en banc Dec. 23, 1980.

336

Gary R. Allen, and David English, Dept. of Justice, Tax Div., Washington, D. C., for Com'r of Internal Revenue.

John F. Emanuel, Milwaukee, Wis., for Home Mut. Ins. Co.

Before CASTLE, Senior Circuit Judge, and PELL and TONE, Circuit Judges.

TONE, Circuit Judge.

This case involves two provisions of the Internal Revenue Code concerning the taxation of mutual casualty insurance companies: § 832(b)(5), which allows a "losses incurred" deduction from the companies' underwriting income; and § 821(e), which permits certain companies a "special transitional underwriting loss" deduction from its statutory underwriting income. The issues

presented are highly technical and can be adequately stated only after a more detailed description of the statute. The Tax Court ruled in favor of the taxpayer on one issue and in favor of the Commissioner on another. We reverse and remand in part and affirm in part.

Mutual casualty insurance companies, including the taxpayer here, Home Mutual Insurance Company, became subject to §§ 832(b)(5) and 821(d) with the passage of the Revenue Act of 1962, Pub.L. No. 87–834, 76 Stat. 960. Before 1963 mutual casualty insurance companies were taxed under a formula that did not include any deduction for underwriting losses or for a special transitional underwriting loss.[1] Beginning with that year, however, these companies have been taxed under a method established by the Revenue Act of 1962, in which a company's taxable income is comprised of three components—taxable investment income, statutory underwriting income, and funds returned from the protection-against-loss account.[2] The statutory underwriting income component consists essentially of underwriting income as it has been computed for nonmutual casualty insurance companies since the 1920's, less a deduction for funds set aside in a protection-against-loss account.[3] Under the decades-old portion of the computation scheme, underwriting income is defined as the amount of premiums earned during the year, less expenses and "losses incurred." I.R.C. § 832(b)(3). The "losses incurred" deduction in turn consists of losses paid during the taxable year netted against cash salvage and reinsurance recoveries, plus any increase (or minus any decrease) during the year in unpaid losses outstanding, minus any increase (or plus any decrease) in salvage and reinsurance recoverable outstanding. I.R.C. § 832(b)(5); Treas.Reg. § 1.832–4(c).[4] The 1962 Revenue Act also provided companies that had experienced underwriting losses during each of the five preceding taxable years with a special transitional underwriting loss deduction to allow them to garner some tax advantage from those recent losses, which had been irrelevant under the prior statute.[5]

The issues before us arose following the Commissioner's assertion of deficiencies in Home Mutual's tax liability for 1966 and 1971 totaling $48,530.71.[6] In a petition for a redetermination of the deficiencies, Home Mutual contended, first, that the Commissioner had erroneously failed to allow it during the years 1963–1966 and in 1971 to lower its figure for unpaid losses outstanding at the start of each year by the amount by which pre-1963 claims settled during the year had been overestimated. Such a reduction would have increased Home Mutual's losses-incurred deduction for those years, thereby decreasing its underwriting

---

1. A mutual casualty insurance company paid a federal income tax either at ordinary corporate rates on its investment income or at a rate of one percent on its gross investment income plus its premium income less policyholder dividends, whichever amount was greater. Int. Rev.Code of 1954, ch. 736, §§ 821 & 822, 68A Stat. 260 (amended 1962).

2. I.R.C. § 821(b); Revenue Act of 1962, Pub.L. No. 87–834, § 8(a), 76 Stat. 960, 989–90. Special provisions not relevant here exist with regard to the taxation of small mutual casualty insurance companies. I.R.C. § 821(c) & (d).

3. I.R.C. §§ 821(b), 823(a), 824(a), & 832(b); Revenue Act of 1962, Pub.L. No. 87–834, § 8(a) & (c), 76 Stat. 960, 989–90, 992–93; see Revenue Act of 1921, ch. 136, § 246(a) & (b), 42 Stat. 227, 262–63. An extra deduction not relevant here was also provided in I.R.C. § 823(c) for companies having gross investment plus premium income of less than $1,100,000.

4. To compute the unpaid losses component of the deduction, a taxpayer is to "add all unpaid losses outstanding at the end of the taxable year and deduct unpaid losses outstanding at the end of the preceding taxable year." I.R.C. § 832(b)(5)(B). Similarly, to take account of salvage and reinsurance recoverable, the taxpayer is to "add salvage and reinsurance recoverable outstanding at the end of the preceding taxable year and deduct salvage and reinsurance recoverable outstanding at the end of the taxable year." I.R.C. § 832(b)(5)(A).

5. I.R.C. § 821(e); Revenue Act of 1962, Pub.L. No. 87–834, § 8(a), 76 Stat. 960, 991.

6. The years 1963, 1964, and 1965 are also relevant to the extent that loss carryovers for those years may affect Home Mutual's liability in 1966 and 1971.

income and thus its tax. Alternatively, Home Mutual argued that its exclusion in its original tax returns during 1963–1966 of cash subrogation recoveries from pre-1963 claims was proper because the underwriting losses incurred on those claims had not lessened its taxes.[7] Home Mutual also raised another claim unrelated to the first two, *viz.*, that it should have been allowed to deduct the special transitional underwriting loss from total underwriting gain rather than from underwriting gain less the protection-against-loss deduction.

In a so-called "reviewed opinion," the Tax Court, with one judge dissenting, ruled in favor of Home Mutual on the proper treatment of "unpaid losses," which made it unnecessary to decide the cash subrogation recoveries issue. The court unanimously agreed with the Commissioner on the special transitional underwriting loss issue.[8] The Commissioner appeals the determination of the unpaid loss issue; Home Mutual cross-appeals the Tax Court's interpretation of the special transitional underwriting loss and asks that, if we reverse on the unpaid losses issue, we rule in its favor on the treatment of subrogation recoveries. We reverse the Tax Court's resolution of the unpaid losses dispute, remand the subrogation recoveries issue, and affirm the court's ruling on the special transitional underwriting loss.

### I

Home Mutual's contentions with respect to the unpaid loss deduction are ultimately grounded in the inequity it perceives in the Code's treatment of its overestimate of unpaid losses outstanding as of December 31, 1962. That overestimate, totaling $402,-314.59,[9] resulted in smaller "losses incurred" deductions in later years than a totally accurate estimate of unpaid losses would have, because, in every year that some of those claims were settled, the unpaid-losses-outstanding account was decreased not only by the amounts paid on those settlements, which were offset by a corresponding increase in paid losses, but also by the overestimates on the claims.

The similar effect in the years of settlement of post-1962 overestimated losses is more than compensated for by the increase in the unpaid losses part of the losses-incurred deduction that the overestimates cause in the years in which the unpaid losses were incurred. In those years the overestimates increase the "unpaid losses outstanding at the end of the taxable year," I.R.C. § 832(b)(5)(B), and thus the losses-incurred deduction. Accordingly, for years after 1962, overestimating defers taxable income by allowing a company to accelerate its unpaid losses in this manner.

Although Home Mutual cannot obtain a similar acceleration of losses with respect to pre-1963 claims because those losses were then irrelevant to the computation of taxable income, it wishes to avoid the "erroneous" decrease of the deduction in the years it settled overestimated pre-1963 losses. By lowering its "unpaid losses outstanding at the end of the preceding taxable year" by the amounts by which pre-1963 claims settled during the year had been overestimated, Home Mutual argues, it will obtain as a deduction its "true" amount of losses incurred since 1962.

Home Mutual's position can be illuminated by an example. Assume first that the company was notified of a claim in 1963 and estimated that $10,000 would be required to settle the claim. That $10,000 would be added to the unpaid-losses-outstanding account. By raising the balance of unpaid

---

7. This treatment of subrogation recoveries was the primary basis for the Commissioner's assertion of deficiency.

   Subrogation recoveries are included within the meaning of the statutory language of "salvage and reinsurance recoverable" in the computation of the losses-incurred deduction. *See Continental Ins. Co. v. United States*, 474 F.2d 661, 663, 664–65, 200 Ct.Cl. 552 (1973).

8. *Home Mutual Ins. Co. v. Commissioner*, 70 T.C. 944 (1978).

9. This overestimate was 14.74% of the $2,729,-746.00 in unpaid losses that Home Mutual reported in its annual statement as of December 31, 1962.

losses outstanding, this addition would increase the losses-incurred deduction from premiums earned to arrive at underwriting income for 1963, thus conferring a tax benefit for that year. The $10,000 would then be carried as an unpaid loss outstanding until paid. Assume the claim is settled in 1965. If the amount of the settlement is $10,000, that amount is removed from unpaid losses outstanding and paid out with no further tax consequences.[10] If, however, the claim is settled for $8000, there are tax consequences in 1965: assuming sufficient income from premiums during the year, the $2000 overestimate is taxed as ordinary income.[11] Now assume that Home Mutual had learned of the claim in 1962, not 1963, and therefore had added the $10,000 to its unpaid losses outstanding in the earlier year. Under the pre-1963 tax scheme, this addition would have had no tax consequences. *See* note 1 *supra.* If the claim is then settled for $8000 in 1965, the company, under the literal terms of the statute, would have to pay tax on the $2000 overestimate in 1965 as above. While in the first instance the taxation of the $2000 occurs only after a company has received a corresponding tax benefit in 1963 by including that amount in the losses-incurred deduction for that year, in the second case taxation of the $2000 would occur despite the absence of such a prior tax benefit. As a remedy, Home Mutual wishes, in computing its taxes for 1965, to lower its unpaid losses outstanding at the beginning of 1965 by $2000 and thereby prevent its inclusion in taxable income in that year.[12]

■ Home Mutual's argument is made in the context of comprehensive, technical, and very specific provisions of the Internal Revenue Code. Especially when dealing with provisions of this kind, and when no support for the theory asserted by the taxpayer can be found in the language of the statute, the appurtenant regulations, or the legislative history, the courts should ordinarily "resist the temptation to attempt any creative rewriting of the Internal Revenue Code."[13]

■ There is nothing in the statutory provision involved in the case at bar, its regulations, or its legislative history revealing even a glimmer of any intent that Home Mutual would be allowed to make the retroactive adjustment it wishes. The statutory formula for computing the losses-incurred deduction was first enacted in § 246(b)(6) of the Revenue Act of 1921, ch. 136, 42 Stat. 227, 263, for use in taxing stock casualty insurance companies and has been reenacted since then without substantial change. As the Tax Court pointed out, "[t]he 1962 Act was designed to tax the mutual companies on much the same basis as the stock companies." 70 T.C. at 945–46. The first regulations concerning the losses-incurred deduction, which were adopted in 1944, expressly recognized that the unpaid-losses-outstanding component of the deduction is an estimate of the total amount of losses incurred but unpaid at year's end.[14] Given the longstanding existence of these regulations interpreting a statutory provision that has remained unchanged, they are deemed to have received congressional ap-

**10.** In finer statutory detail, the payment of the claim would decrease the balance of unpaid losses outstanding by $10,000, and would increase the amount of losses paid during the year by that amount.

**11.** In these circumstances, the balance of the unpaid-losses-outstanding account would be decreased by $10,000 while the amount of losses paid would be augmented by only $8000. Thus, the losses-incurred deduction would be reduced by $2000.

If there is not sufficient premium income, the $2,000 would reduce the unused loss deduction provided by § 825 eligible for carrybacks and carryovers.

**12.** Thus, the net decrease in the balance of unpaid losses outstanding during 1965 would be only $8000, offsetting exactly the increase in the amount of losses paid.

**13.** *United States v. Foster Lumber Co.,* 429 U.S. 32, 49, 97 S.Ct. 204, 214, 50 L.Ed.2d 199 (1976) (Stevens, J., concurring).

**14.** Treas.Reg. 111, § 29.204–2, 1944 C.B. 336–37 (recodified as Treas.Reg. 118, § 39.204–2(a) & (b), 26 C.F.R. § 39.204–2(a) & (b) (1953 ed.) by Revenue Ruling 53–226, 1953–2 C.B. 500); *see also* Treas.Reg. § 1.832–4(a)(5) & (b).

proval and have the effect of law. *See United States v. Correll*, 389 U.S. 299, 305–06, 88 S.Ct. 445, 448–49, 19 L.Ed.2d 537 (1967); *Hanover Insurance Co. v. Commissioner*, 598 F.2d 1211, 1219 n.17 (1st Cir.), *cert. denied*, 444 U.S. 915, 100 S.Ct. 229, 62 L.Ed.2d 169 (1979). In addition, the casualty insurance industry has adapted its own reporting forms for use under the regulations, so that the forms now serve as the basis on which a company's income is determined. *See Hanover Insurance Co. v. Commissioner*, 65 T.C. 715, 720–21 (1976);[15] *Continental Insurance Co. v. United States*, 474 F.2d 661, 666–67, 200 Ct.Cl. 552 (1973). Since the unpaid losses component of the losses-incurred deduction is merely an estimate, the only allowable adjustment by either the Commissioner or taxpayer would be to correct a figure that was not a "fair and reasonable" estimate given the facts at the time the estimate was made. *See Hanover Insurance Co. v. Commissioner*, 598 F.2d 1211 (1st Cir.), *cert. denied*, 444 U.S. 915, 100 S.Ct. 229, 62 L.Ed.2d 169 (1979); Treas.Reg. § 1.832–4(b).[16] Home Mutual admits that no legislative history of the 1962 Revenue Act supports its attempt to go outside the language of the statute. In light of this absence of statutory support for the adjustment desired by Home Mutual, only the existence of a principled extrastatutory ground for adjustment could persuade us to go beyond the express bounds of the statute.

We consider in turn two theories that have been advanced to support the adjustment Home Mutual seeks. The Tax Court majority's theory, which Home Mutual does not attempt to support in this court, was that the adjustment is analogous to permissible retroactive adjustments of inventories and also to the adjustment of bad debt reserve permitted by Revenue Ruling 58–126, 1958–1 C.B. 13. Home Mutual presents an argument that the Tax Court appeared to reject, that the tax benefit rule allows such an adjustment. We are not persuaded by the reasoning of the Tax Court majority or Home Mutual.

### A.

In each of the cases the Tax Court majority believed analogous, a taxpayer has been allowed to adjust the value of opening inventory (the closing inventory of the preceding year) after its original calculation. *See, e. g., Elm City Nursery Co. v. Commissioner*, 6 B.T.A. 89 (1927), *acq.*, VI–2 C.B. 2; *Baumann Rubber Co. v. Commissioner*, 4 B.T.A. 671 (1926). These adjustments have, however, served only to correct errors in reporting facts ascertainable at the time of the original calculation. In *Baumann Rubber Co.* the taxpayer had incorrectly counted the items in the inventory, an error that was later discovered and that the Board of Tax Appeals allowed the taxpayer to correct. In *Elm City Nursery Co.* the value of the inventory had been ascertainable, but the taxpayer had deliberately inflated the figures for the purpose of borrowing funds. When the taxpayer demonstrated that the actual inventory value had been less, the Board of Appeals allowed the taxpayer to reduce its inventory figures accordingly and arrive at an accurate amount for cost of goods sold.

In the case at bar, however, taxpayer is not attempting to adjust its unpaid losses outstanding to an amount that could have been determined from facts existing at the

---

**15.** In *Hanover Ins. Co. v. Commissioner*, 65 T.C. 715 (1976), the Tax Court denied Hanover's motion to dismiss. An appeal of that decision was dismissed. The Tax Court then rendered an opinion on the merits at 69 T.C. 260 (1977), which was affirmed by the First Circuit in the opinion at 598 F.2d 1211, which we also cite in our opinion.

**16.** Home Mutual argues that the Commissioner's power under *Hanover Insurance Co.*, to adjust a taxpayer's unpaid losses outstanding retroactively and his policies allowing retroactive adjustment by his auditors are authority for allowing Home Mutual to adjust its unpaid losses retroactively in light of what was actually paid. However, the Commissioner's authority is limited to the retroactive adjustment of an original estimate that, given the facts and circumstances at the time, was not a fair and reasonable estimate; that authority does not permit the Commissioner, or Home Mutual, to adjust an estimate retroactively so as to equal the amount later actually paid.

time of the original estimate. Strictly analogous to those cases in this situation would be a showing by taxpayer that, given the facts existing at the end of the year preceding the taxable year, its estimate of unpaid losses was unreasonable. *See Hanover Insurance Co. v. Commissioner*, 598 F.2d 1211 (1st Cir.), *cert. denied*, —— U.S. ——, 100 S.Ct. 229, 62 L.Ed.2d 169 (1979). Instead, Home Mutual here wishes to change the estimate of an unpaid loss to the amount actually paid to settle that particular claim. Courts have not permitted taxpayers to make inventory adjustments because of subsequent events. *See Estate of Stauffer v. Commissioner*, 48 T.C. 277 (1967), *rev'd on other grounds*, 403 F.2d 611 (9th Cir. 1968).

This reasoning has the additional defect of not being limited in principle to application to the estimates of unpaid losses incurred prior to 1963. The estimate of an unpaid loss incurred in 1965, for instance, could also prove to be higher than the actual amount of a settlement ultimately reached in a later year. However, nothing in this theory would prevent the taxpayer from reducing its opening unpaid-losses-outstanding account for the year of settlement by the amount of the overestimate and thereby change the deferment of income contemplated by the congressional scheme into an outright exemption.[17] Such a rationale plainly cannot be accepted.

Likewise unpersuasive is the analogy to Revenue Ruling 58–126, which permitted a savings and loan association that first became subject to taxation in 1952 to transfer the amount by which its pre-1952 loss reserve was found to be excessive from the reserve to its undivided profits without producing gross income.[18] Although the loss reserve of a savings and loan association is similar to a mutual casualty insurance company's unpaid loss account, the Code provisions allowing the two deductions are structured differently. A loss reserve is merely a method of utilizing the bad debt deduction. A taxpayer may deduct worthless debts in the year they become worthless pursuant to § 166. Alternatively, under § 593 a taxpayer may deduct a reasonable amount each year to be set aside to cover worthless debts generally.[19] When specific debts do become worthless, they are charged off against the reserve with no direct tax consequences.[20]

**17.** Exemption would result because the increase in the losses-incurred deduction in the year that a loss is incurred is never counterbalanced later by a decrease in the deduction in the year in which the loss is paid. *See* text at notes 9–12 *supra*.

**18.** The Revenue Ruling also decided that any such transfer that lowered the loss reserve below the aggregate amount of post-1951 additions to the reserve deducted for federal income tax purposes, minus charge-offs for bad debt losses after 1951, and plus recoveries on debts charged to the reserve after 1951 would result in gross income to the extent of the diminution.

**19.** Taxpayers eligible for use of reserves for losses on loans include mutual savings banks not having capital stock represented by shares. I.R.C. § 593(a).

The amount a taxpayer may set aside is subject to various statutory and regulatory limitations. I.R.C. § 593(b); Treas.Reg. § 1.593.

The Tax Reform Act of 1969 enacted § 585, a provision parallel to § 593 that is available to banks not eligible under § 593 and to certain other financial institutions. Tax Reform Act of 1969, Pub.L. No. 91–172, § 431(a), 83 Stat. 487, 616–18.

**20.** The actual charging off of a bad debt does have indirect tax consequences. In 1958, when Revenue Ruling 58–126 was issued, the amount of a deductible addition to a reserve was limited to the lesser of—

(1) the amount of its taxable income for the taxable year, computed without regard to this section, or

(2) the amount by which 12 percent of the total deposits or withdrawable accounts of its depositors at the close of such year exceeds the sum of its surplus, undivided profits, and reserves at the beginning of the taxable year. Int.Rev.Code of 1954, ch. 736, § 593, 68A Stat. 205. Because the balance of the reserve at the beginning of the taxable year was relevant to computation of the second alternative ceiling, the charging off of a bad debt, by lowering the balance of the reserve, increased the ceiling for permissible additions in subsequent years. Although current provisions placing a ceiling on the amount a taxpayer may add to a reserve are much more complicated, the effect of charging off a bad debt (or crediting recovery of an earlier bad debt) is much the same. Section 585(b)(2) and § 585(b)(3), relevant through § 593(b)(3) and § 593(b)(1)(A) respectively, establish two potential ceilings on the deduction

In similar fashion a mutual casualty insurance company will set aside funds it estimates are necessary to cover pending claims.[21] The Code, however, does not treat these funds as a § 593 loss reserve. If it did, a taxpayer would have a choice: either it could deduct specific losses when they accrue or are paid or it could deduct a reasonable amount each year as an addition to a reserve and merely charge off against the reserve all losses when actually paid. Instead, a taxpayer has no choice; only one statutory method exists for deducting underwriting losses of mutual casualty insurance companies. Under that method, when a loss is "incurred" through the assertion of a claim but not paid during the year, the estimated amount thereof is added to the unpaid-losses-outstanding "reserve"; in the later year in which the claim is actually paid, the amount of the estimate is subtracted from unpaid losses outstanding and the amount of the payment is added to losses paid. Another contrast with the § 593 reserve is that none of the losses actually paid during a taxable year is merely charged off against a reserve. All losses paid, including those from prior years that have been carried as part of the unpaid-losses-outstanding "reserve," are added into the losses-incurred deduction.[22] Another difference between the two statutory mechanisms is the different significance attached to changes in the reserve. The only change in a § 593 reserve with direct tax consequences is the addition of a reasonable amount during the year; the actual payment of a loss is charged off against the reserve but has no direct tax consequences. In contrast, all modifications of an unpaid-losses-outstanding reserve directly affect the amount of a taxpayer's deduction for losses incurred. Indeed, if the balance of the unpaid-losses-outstanding reserve decreased over the course of the taxable year, the losses-incurred deduction itself is diminished for that year.

The differing structures of the statutory schemes directly affect the issue under consideration here. Under the provisions of the statute relevant in Revenue Ruling 58–126, the loss reserves accumulated before 1952 were irrelevant to computation of the savings and loan association's income beginning that year.[23] In contrast, the express terms of § 832(b)(5) make the amount of the unpaid losses outstanding estimated for pre-1963 claims relevant in determining taxable income after 1962. Thus, while savings and loan association income set aside in a loss reserve when that income is not taxable may not be taxed if returned to undivided profits in a year in which income of a like kind is taxed, that result does not compel the conclusion that we should interpret a different statutory scheme as allowing Home Mutual to adjust its estimate of pre-1963 claims at the beginning of a taxable year according to the actual amounts paid during that year.

Further support for our conclusion is provided by *Pacific Mutual Life Insurance Co.*, 48 T.C. 118 (1967), *rev'd on other grounds*, 413 F.2d 55 (9th Cir. 1969), and

permissible for an addition to a bad debt reserve. In both, the charging off of bad debts (and the crediting of recoveries) during prior years and the taxable year are relevant to computation of the ceilings. I.R.C. § 585(b)(2) & (b)(3)(A).

21. However, while additions are generally made to a loss reserve without any evaluation of the likelihood that particular debts will soon become worthless, more than 95% of Home Mutual's unpaid losses outstanding on December 31, 1962 consisted of estimates of the amounts necessary to pay particular claims.

22. This procedure does not result in a double deduction for a loss included in prior years as part of unpaid losses outstanding. In the year of payment, the amount paid becomes part of "losses paid" and thus increases the losses-incurred deduction. Yet at the same time, the balance of "unpaid losses outstanding" is decreased by the amount of the estimated loss included earlier in the account for that claim, effectively reducing the deduction by that amount. If the actual payment of a claim equals the earlier estimate, the procedure results in a complete washout, the addition to the losses actually paid being exactly counterbalanced by the decrease in the unpaid losses outstanding.

23. Revenue Ruling 58–126 has thus been explained in Rev.Rul. 73–273, 1973–1 C.B. 79.

*Lutheran Mutual Life Insurance Co. v. United States*, 602 F.2d 328 (Ct.Cl.1979), *petition for cert. filed*, 48 U.S.L.W. 3570 (U.S. Feb. 23, 1980), which concerned questions very similar to the one before us that arose under taxing mechanisms enacted in the Life Insurance Company Income Tax Act of 1959 that were, unlike the bad debt mechanism discussed above, very similar to the one here. Both cases involved efforts by taxpayers to lower their opening reserves to reflect actual experience during the year and thus avoid hardship attending Congress' imposition of a new taxing formula. Although the courts differed somewhat in their evaluation of legislative history common to both cases, both agreed that the explicit language of the statute precluded adjustment of a reserve that, in the words of the court in the *Pacific Mutual* case, "at the time it was established, was based upon all available information and contained no mathematical error." 48 T.C. at 129.[24] The same result must be reached at bar, where there is no legislative history that even arguably supports the taxpayer's position.

### B.

Home Mutual argues that we should affirm the Tax Court on this issue on the basis of the tax benefit rule and allow reduction of unpaid losses outstanding at the beginning of each taxable year by the amount by which amounts actually paid that year on pre-1963 claims fell below original estimates. The tax benefit rule is a well established judge-made rule[25] that despite partial codification in § 111 remains substantially extra-statutory in nature and affects a taxpayer's taxable income beyond the literal meaning of the Code itself. Thus it is not sufficient to rebut the invocation of the tax benefit rule to argue that the statute makes no provision for its use here or to cite *Pacific Mutual* and *Lutheran Mutual*, where the tax benefit rule was not considered. Upon examining the contours of the tax benefit rule itself, however, we conclude that it does not apply in this case.

The tax benefit rule is "both a rule of inclusion and exclusion: recovery of an item previously deducted must be *included* in income; that portion of the recovery not resulting in a prior tax benefit is *excluded*."[26] Until 1929 it was unclear, in light of *Eisner v. Macomber*'s definition of income as "gain derived from capital, from labor, or from both combined," whether a taxpayer was required to report recoveries of funds owed to it that had previously been deducted.[27] Although various justifications have been offered for requiring taxpayers to report funds received from what normally is not viewed as an income-producing event, perhaps the best is that the inclusionary aspect of the tax benefit rule counterbalances the annual accounting principle enunciated in *Burnet v. Sanford & Brooks*, 282 U.S. 359, 51 S.Ct. 150, 75 L.Ed. 383 (1931). A taxpayer should not be per-

24. The Tax Court also held that, even if the statute would allow an adjustment, Pacific Mutual had not in fact proved the ultimate amount of its liabilities on pre-1958 claims and thus that its opening reserves for 1958 were overestimated. *Id.* at 129–31. The Tax Court in the case at bar and Home Mutual both attempt to distinguish *Pacific Mutual* on the grounds that Home Mutual has proved that its opening reserves in 1963 were overstated. However, "where a decision rests on two or more grounds, none can be relegated to the category of *obiter dictum*." *Woods v. Interstate Realty Co.*, 337 U.S. 535, 537, 69 S.Ct. 1235, 1237, 93 L.Ed. 1524 (1949).

25. *See First Trust & Savs. Bank of Taylorville v. United States*, 614 F.2d 1142, 1144 & n. 2 (7th Cir. 1980).

26. *Putoma Corp. v. Commissioner*, 66 T.C. 652, 664 n. 10 (1976), *aff'd*, 601 F.2d 734 (5th Cir. 1979) (emphasis in original). *See* Bittker & Kanner, *The Tax Benefit Rule*, 26 U.C.L.A. L.Rev. 265, 267–72 & n. 20 (1978). The tax benefit rule is not limited to the recoveries of deductions. It also covers recoveries of items that had earlier resulted in tax credits and of funds, such as embezzled monies, that were never included in gross income. *See California & Hawaiian Ref. Corp. v. United States*, 311 F.2d 235, 238 n. 1 (Ct.Cl.1962); 1 J. Mertens, *The Law of Federal Income Taxation* § 7.34, at 114 (rev. ed. 1974).

27. *Eisner v. Macomber*, 252 U.S. 189, 207, 40 S.Ct. 189, 193, 64 L.Ed. 521 (1920). *See* Bittker & Kanner, *supra* note 26, at 266.

mitted to take advantage of the tax system's need to treat transactions as final at the end of the accounting year so that tax consequences can be calculated. The rule allows accurate taxation of a whole transaction that may span several accounting periods.[28] In short, the inclusionary aspect of the rule, which is based entirely on case law,[29] "recognizes the 'recovery' in the current year of taxable income earned in an earlier year but offset by the item deducted."[30] Because such recoveries are reportable due to the existence of previous deductions, taxpayers have successfully argued that the recoveries should be included in income only to the extent that the earlier deduction had in fact served to reduce its taxable income in the year in which the deduction was taken. This exclusionary aspect of the tax benefit rule was not conclusively accepted until 1942, when Congress enacted the statutory predecessor to current § 111.[31] Although § 111 expressly provides for such exclusion only for the recovery of previously deducted bad debts, taxes, and delinquency amounts, it is well settled that this aspect of the tax benefit extends beyond the literal terms of the statute.[32] Thus, although the exclusionary part of the tax benefit rule finds a statutory anchor, the entire rule remains in essence an extra-statutory judicial rule permitting retroactive adjustments so that some trans-actions substantially altered in years subsequent to the original accounting period may be taxed virtually as though the entire transaction had occurred in one accounting period.[33]

Home Mutual invokes the tax benefit rule's exclusionary aspect in its argument that it should not be required to reduce its losses-incurred deduction by the amount of its overestimation of its pre-1963 claims paid later. According to Home Mutual, when the company receives notice of a claim against one of its policies, its estimate of the amount necessary to cover the claim is entered as an accrued liability and, after 1962, effectively deducted as a "loss incurred" under § 832(b)(5). If in a later year a lesser amount satisfies the claim, the company "recovers" the amount by which it overestimated the claim, restores the amount of this "overaccrual" to its earned surplus, and pays tax on this amount as income, again through the workings of § 832(b)(5). See text at notes 10–12 supra.

■ The fact that the deduction occurred by means of a bookkeeping accrual and recovery by a mere reversal of that accrual, with the money never leaving the taxpayer's coffers, does not preclude the application of the tax benefit rule.[34] Tax benefit principles, if not the rule itself, have

---

**28.** See Bittker & Kanner, supra note 26, at 267–70.

**29.** See 1 J. Mertens, supra note 26, § 7.34, at 111.

**30.** Munter's Estate v. Commissioner, 63 T.C. 663, 678 (1975) (Tannenwald, J., concurring).

**31.** See Bittker & Kanner, supra note 26, at 271; 1 J. Mertens, supra note 26, § 7.34, at 111–12 n. 40; California & Hawaiian Sugar Ref. Corp. v. United States, 311 F.2d 235, 238 n. 3, 159 Ct.Cl. 561 (1962).

**32.** See Bittker & Kanner, supra note 26, at 266–67, 271; 1 J. Mertens, supra note 26, § 7.34, at 112–14 & nn. 42.1–44, & § 7.37, at 124–25; Dobson v. Commissioner, 320 U.S. 489, 64 S.Ct. 239, 88 L.Ed. 248 (1943); California & Hawaiian Sugar Ref. Corp. v. United States, 311 F.2d 235, 238–39, 159 Ct.Cl. 561 (1962); Home Savings & Loan Co., 39 T.C. 368,

370 (1962), acq., 1963–2 C.B. 4, 1965–2 C.B. 5; Birmingham Terminal Co., 17 T.C. 1011, 1014 (1951), acq., 1952–1 C.B. 1; M & E Corp., 7 T.C. 1276 (1946), acq., 1947–1 C.B. 3. See also Treas.Reg. § 1.111–1(a).

**33.** Because recoveries are treated as income in the year recovered rather than in the year originally deducted and because marginal tax rates vary with the amount of other income, the tax benefit rule is not likely to result in taxpayer paying precisely the same amount of extra tax in the year of recovery as the amount of tax saved by the earlier deduction. See Bittker & Kanner, supra note 26, at 270–271; 1 J. Mertens, supra note 26, § 7.37, at 129–30.

**34.** See Lime Cola Co., 22 T.C. 593 (1954), acq., 1955–2 C.B. 7; M & E Corp., 7 T.C. 1276 (1946), acq., 1947–1 C.B. 3; 1 J. Mertens, supra note 26, § 7.37, at 128 & n. 82 & 130.

been held to apply to the release of funds from reserve accounts.[35]

Similarly, it is not critical to the applicability of the tax benefit rule that, because the amount of Home Mutual's underwriting losses was not relevant under the statute before 1963, no deduction was ever taken for pre-1963 unpaid losses incurred. Although the strict language of § 111 requires that a taxpayer have taken a deduction or credit before it may show that that deduction or credit produced no benefit and exclude the recovery from income, it has been held that taxpayers completely exempt from federal income taxation at the time the expense was taken are eligible for tax benefit treatment.[36] Thus prior expenses not taken as deductions or credits because entirely irrelevant to the computation of taxpayer's taxable income would seem eligible for tax benefit treatment.

■ On the basis of these principles, Home Mutual argues that, because the funds set aside to cover the claim provided it with no tax benefit, their transfer to earned surplus is not subject to tax under the exclusionary aspect of the tax benefit rule.[37]

■ More is required, however, for application of the tax benefit rule. Home Mutual wishes us to apply the exclusionary aspect of the tax benefit rule even though the rule has had no role in ensuring that the "recoveries" are taxed. In the cases we have examined, with the possible exception noted in the margin,[38] the exclusionary as-

---

**35.** *See Maryland Casualty Co. v. United States,* 251 U.S. 342, 352, 40 S.Ct. 155, 158, 64 L.Ed. 297 (1920) (dictum) (inclusionary aspect); *Dallas Title & Guaranty Co.,* 40 B.T.A. 1022, 1028–32 (1939), *rev'd on other grounds,* 119 F.2d 211 (5th Cir. 1941) (inclusionary aspect); *M & E Corp.,* 7 T.C. 1276 (1946), *acq.,* 1947–1 C.B. 3 (exclusionary aspect). *Dallas Title* also excluded released reserves from income to the extent they represented prior deductions that, although benefitting taxpayer, were improper.

**36.** *See Home Savings & Loan Co.,* 39 T.C. 368 (1962), *acq.,* 1963–2 C.B. 4, 1965–2 C.B. 5; *California & Hawaiian Ref. Corp. v. United States,* 311 F.2d 235, 237–40, 159 Ct.Cl. 561 (1962).

**37.** Alternatively, Home Mutual argues that the funds set aside were actually earned by the company prior to 1963 and thus should not be subjected to taxation now. To this contention we think it a sufficient answer to say that, absent a well established judge-made exception, the Code itself, as amplified by its regulations, determines what is taxable income.

**38.** One recent Tax Court judge has applied the exclusionary aspect of the tax benefit rule to the treatment of salvage and reinsurance recoverable under § 832(b)(5). In *American Financial Corp. v. Commissioner,* 72 T.C. 506 (1979), taxpayer, a stock casualty insurance company taxed during the entire relevant period on a cash basis accounting method under the same provisions that have applied to Home Mutual since 1962, claimed losses-incurred deductions in various years prior to 1960. Because of net operating losses subsequently incurred and the expiration of net operating loss carryovers relating to the pre-1960 years, these deductions ultimately resulted in no tax benefit for taxpayer. In 1966, taxpayer received various salvage and subrogation proceeds related to these pre-1960 claims, which it did not include in its computation of losses incurred on the grounds that they should be excluded under § 111. In the course of ruling in favor of taxpayer, Judge Dawson rejected the Commissioner's argument that § 111 was inapplicable because such recoveries were not items of income in the statutory scheme, but merely offsets to the deduction for losses incurred. Judge Dawson concluded that accepting the Commissioner's theory could lead to "absurd and unintended results." 72 T.C. at 514. In a year in which a cash basis taxpayer received more in salvage recoveries than it paid in claims, the Commissioner's theory would prevent inclusion of this excess in taxpayer's gross income. Noting that "[s]ection 832(b)(5) does not provide that salvage can be used *only* as an offset," *id.* (emphasis added), Judge Dawson thought it unlikely that the Commissioner would fail to invoke the inclusionary aspect of the tax benefit rule in that case. Putting technical niceties aside, Judge Dawson concluded that salvage and subrogation recoveries were items of gross income and the tax benefit rule applied.

For the reasons stated in the text, we believe the use of the exclusionary aspect of the tax benefit rule to be improper in the case at bar. We are not persuaded to the contrary by the reasoning of *American Financial Corp.* While § 832(b)(5) arguably does not prohibit the Commissioner from including the excess of salvage recoveries over paid claims in gross income on the basis of the tax benefit rule, we believe that the exclusionary aspect of the rule may properly be invoked only to that extent. Indeed, the facts of *American Financial Corp.* themselves reinforce our conclusion. Application of the tax benefit rule's exclusionary aspect years after the expiration of the loss carryovers effec-

pect of the tax benefit rule becomes relevant only after the Commissioner has employed the inclusionary aspect of the rule to include in gross income recoveries that according to the strict terms of the statute are not income.[39] The historical origin of the rule noted above supports an interpretation of the rule that requires use of the inclusionary aspect of the rule before a taxpayer can employ the exclusionary aspect. The inclusionary aspect of the tax benefit rule does not come into play in the situation at bar. "Recoveries" of the amounts of overestimates of actual liability on unpaid losses are taxed not by operation of the tax benefit rule to make such recoveries items of gross income under § 61(a), but by the specific terms of a detailed statutory mechanism, which requires downward adjustment of a taxpayer's unpaid losses outstanding at the end of the year during which the claim is actually paid by the amount of the original estimate. *See* text at notes 10–12 *supra*.[40] Thus the case at bar does not fall within the established scope of the tax benefit rule. In light of the principle inhibiting creative judicial rewriting of the statutory language, *see* text

at notes 13–14 *supra*, we decline to expand the tax benefit rule to allow Home Mutual to go beyond the literal terms of this statute and retroactively adjust its unpaid losses outstanding at the beginning of a taxable year by the amount by which it had originally overestimated its ultimate liability on claims paid during the year.

## II.

In the alternative, Home Mutual argues that it need not include any cash salvage and subrogation recoveries made on pre-1963 claims. Home Mutual concedes that the literal language of the statute and regulations would require such inclusion,[41] but argues that the tax benefit rule allows exclusion of these recoveries from the computation of the losses-incurred deduction because they relate to losses from which Home Mutual derived no tax benefit. It cites *American Financial Corp. v. Commissioner*, 72 T.C. 506 (1979), in support of its position. Although we are not persuaded by the relevant reasoning in that case, *see* note 38 *supra*, possible grounds exist for distinguishing between the unpaid losses issue and the cash subrogation recoveries is-

tively allows taxpayer to offset recoveries that by the terms of the statute and regulations, not by application of the tax benefit rule, should increase income. Use of the tax benefit rule would, in effect, abrogate the statutory limitation prohibiting a taxpayer from carrying forward net operating losses indefinitely and allow a taxpayer to revive long-expired deductions in the year of recovery.

**39.** *Home Savings & Loan Co.*, 39 T.C. 368 (1962), *acq.* 1963–2 C.B. 4, 1965–2 C.B. 5, is in accord with this analysis. The taxpayer, exempt from federal income taxation until 1952, received refunds in 1956 for state property taxes improperly collected from 1947 through 1951. Although the Commission attempted to include the refunds in income as an item of gross income solely by means of a bald assertion of I.R.C. § 61(a), the Tax Court indicated that the recoveries could be included as income only under the inclusionary aspect of the tax benefit rule, quoting and citing *Perry v. United States*, 160 F.Supp. 270, 142 Ct.Cl. 7 (1958), an inclusionary tax benefit rule case. Because the state taxes, when paid, produced no tax benefit, the court then concluded that the exclusionary aspect also applied.

**40.** Under the statutory mechanism, some recoveries that might be included in gross income

under tax benefit principles are not taxed at all. If salvage recoveries for a cash basis taxpayer exceed its losses paid during the year, that excess is not taxed. *See American Financial Corp., supra* note 38, 72 T.C. at 514. Similarly, under the simplifying assumption that no other unpaid losses accrue or are paid during the year, the amount by which the sums paid during the year to settle overestimated pre-1963 claims exceed the sum of paid losses (after subtracting cash salvage and reinsurance recoveries) and the decrease in salvage and reinsurance recoverable is not taxed even though that excess represents funds released for general use by the taxpayer. Only if the Commissioner attempts to include these excesses in a taxpayer's gross income through use of the tax benefit rule may taxpayer use the exclusionary aspect of the rule.

**41.** Strictly speaking, Treasury Regulation § 1.832–4(c), and not the statutory provisions themselves, make cash salvage and subrogation recoveries relevant to the computation of the losses-incurred deduction by requiring them to be subtracted from losses paid during the taxable year.

sue. For instance, because no explicit statutory basis exists for the regulation requiring the subtraction of cash salvage and reinsurance recoveries from paid losses in the computation of the losses-incurred deduction, it is arguable that the only authority for the regulation is the inclusionary aspect of the tax benefit rule. If the tax benefit rule is the ultimate authority for requiring that cash recoveries be used to increase a taxpayer's taxable income, it might be appropriate to allow a taxpayer to invoke the rule's exclusionary aspect. At oral argument counsel for the Commissioner admitted that the cash subrogation recoveries issue was a closer question than the unpaid losses issue.[42] Because of the absence of prior Tax Court consideration of these complexities in the case at bar, we remand this issue to that court for its consideration.

### III.

■ In an argument independent of its first two, Home Mutual contends that it should have been permitted to deduct the special transitional underwriting loss provided by § 821(e) from the total underwriting gain rather than from underwriting gain less the protection-against-loss deduction allowed by § 824(a). Home Mutual argues for this result on the grounds that the relevant statutory provisions are in irreconcilable conflict and that the legislative history of § 821(e) shows it to be remedial legislation, which must be broadly construed to effectuate its purpose. We find no irreconcilable conflict but merely a statutory scheme that does not by its terms allow Home Mutual as much benefit from its special transitional underwriting loss as it would like.

■ The special transitional underwriting loss allowed by § 821(e) is a special reduction in the "statutory underwriting income" of any mutual casualty insurance company that was taxable for the five taxable years preceding January 1, 1962 under § 821 as it existed before the 1962 Revenue Act and that sustained an underwriting loss in each of those five years. In any taxable year between 1963 and 1967 inclusive, a company can use the aggregate of these underwriting losses, to the extent not used before under this subsection, to offset its statutory underwriting income. After the company's 1967 taxable year, any unused special transitional underwriting loss expires. For purposes of § 821(e), "statutory underwriting income" is defined in § 823(a)(1). Treas.Reg. § 1.821–5(a). That section specifies that to compute statutory underwriting income, one must subtract the deduction provided by § 824(a) for the amount added to the protection-against-loss account. Thus under the clear statutory language, Home Mutual is entitled to deduct its special transitional underwriting loss only after the protection-against-loss deduction has been taken.

■ Home Mutual argues, however, that § 821(b)(1)(C) and § 824(d) create an irreconcilable conflict. The latter section mandates that certain subtractions be made each year from the protection-against-loss (PAL) account. Under some circumstances, the entire amount of the PAL deduction added to the account under § 824(b) will immediately be subtracted from the account under § 824(d). Section 821(b)(1)(C) requires that the total amount subtracted from the PAL account under § 824(d) be included in a mutual insurance company's taxable income. Thus the PAL deduction granted from the company's statutory underwriting income for a year may effectively be taken away that same year through the add-back requirement of § 821(b)(1)(C). Under the terms of the statute explained in the preceding paragraph the company may not use the special transitional underwriting loss to offset the amount of the PAL deduction added back to income but must employ the unused loss carryovers and carrybacks provided by § 825. Because of this limitation Home Mutual had to employ part of its unused loss carryovers available through 1968 and

---

**42.** In addition, in his main brief before this court, the Commissioner suggested that we remand this issue if its resolution became necessary for decision of this case.

1969, rather than part of its special transitional underwriting loss expiring after 1967, to offset the amount of the PAL deduction added back to income in 1965 and 1966. Home Mutual was left with unused, expired special transitional underwriting loss of $217,117.31 that could otherwise have offset this income and loss carryovers for 1968 and 1969 that were correspondingly depleted.[43] Citing legislative history showing generally that § 821(e) was remedial legislation, Home Mutual argues that the special transitional underwriting loss should be available to offset statutory underwriting income after a "net" PAL deduction computed after the implementation of § 824(d). Only in this way, according to Home Mutual, can conflicting provisions be reconciled so as to give Home Mutual full use of its special transitional underwriting loss, in harmony with the remedial purpose of § 821(e).

■ We perceive no irreconcilable conflict in this statutory scheme. Home Mutual is not caught in a maze of conflicting statutory demands with no exit. There is an exit, just not one to Home Mutual's liking. The PAL deduction is added back to income, but as an element totally separate from statutory underwriting income. Congress established the protection-against-loss account in recognition of mutual casualty insurance companies' lack of access to the capital market for funds with which to pay losses. Section 824 allows companies to set aside part of their underwriting gain each year, which would otherwise be taxed, in a

special account for protection against losses. The bulk of the funds is set aside for a period as long as five years until needed to pay losses. All the gain set aside will eventually be taxed, but the tax is deferred until the funds are used to cover losses or until the five-year period expires. Section 824(d) serves as the detailed formal mechanism for withdrawal of money from the account as losses occur during those five years, for establishment of a ceiling on the total amount set aside at one time, and for return of most of the unused funds to earned surplus after the five-year period. *See* S.Rep.No.1881, 87th Cong., 2d Sess. 54–55 (1962), *reprinted in* [1962] U.S.Code Cong. & Admin.News, pp. 3297, 3357–58 *and* 1962–3 C.B. 703, 760–61; H.R.Rep.No. 1447, 87th Cong., 2d Sess. (1962), *reprinted in* 1962–3 C.B. 402, 446–47; *see also* 8 J. Mertens, *The Law of Federal Income Taxation* § 44.58a, at 209–11 (rev. ed. 1978). Thus the amount of underwriting gain removed to the protection-against-loss account becomes a special category of income on which taxation is deferred. That the financial performance of a company in a particular taxable year may require that the amount removed from that year's underwriting gain be used, in effect, to cover losses of the same year does not transform those funds back into statutory underwriting income. The statutory scheme is both clear and comprehensible.[44]

■ Home Mutual cites legislative history to show that enactment of § 821(e) was

---

**43.** Home Mutual's original special transitional underwriting loss totaled $936,698.29. Under Home Mutual's method, it would have used $450,364.68 before its expiration after 1967. Under Commissioner's computation method, only $233,247.37 would have been used.

**44.** One specific argument of conflict results from a potential ambiguity in the calculation of the PAL deduction created by the language of § 821(e)(2). That subsection states that "the statutory underwriting income of a company [eligible for the special transitional underwriting loss] shall be the statutory underwriting income for the taxable year . . . reduced by [the special transitional underwriting loss]." Section 824(a)(1), which provides that a part of the PAL deduction is a percentage of underwriting gain, defines underwriting gain as

"statutory underwriting income, computed without any deduction under this subsection." Thus, one could argue, as Home Mutual apparently does, that its statutory underwriting income for purposes of calculating the PAL deduction is the amount resulting after deduction of the special transitional underwriting loss. This interpretation would seem to give deduction of the special transitional underwriting loss priority over the PAL deduction and thus create a conflict with the bare language of the statute, which allows the former deduction only after subtraction of the PAL deduction. However, Treasury Regulation § 1.824–1(a) resolves any ambiguity by explicitly providing that "statutory underwriting income" for purposes of computing the PAL deduction is "as defined in section 823(a)."

intended as a remedial measure. That it was, and Home Mutual has benefitted from its use. However, that legislative history does not permit us to ride roughshod over the statutory language and provide greater benefit to a taxpayer than that provided by the terms of the statute itself.

Pursuant to Rule 39(a) and (b) of the Federal Rules of Appellate Procedure,[45] the costs of this appeal will be taxed against Home Mutual. The decision of the Tax Court is hereby affirmed in part, reversed in part, and remanded in part.

PELL, Circuit Judge, dissenting in part, concurring in part.

At the risk of taking an overly simplified view of a more than ordinarily complicated example of tax law, and notwithstanding the scholarly analysis and treatment by the majority opinion of the issues presented, I respectfully dissent as to the matter of the tax benefit rule.

The ultimate situation appears to me as follows: When the losses which comprised the December 31, 1962, unpaid loss accrual were settled at less than the amount accrued therefor, Home Mutual received, in effect, a "recovery" of a prior expense. By means of bookkeeping entries these excess accruals were eliminated from its liabilities and restored to its earned surplus. Under the "tax benefit rule," as developed by numerous court decisions (which decisions are discussed in the majority opinion), such recoveries of prior expenses are includable in taxable income *only* to the extent that some "tax benefit" was received from their deduction against taxable income in a prior year. In Home Mutual's case, no prior tax benefit was received from the accrual of its unpaid losses as of December 31, 1962, because mutual insurance companies, such as Home Mutual, were not taxed on their underwriting income prior to 1963. Therefore the tax benefit rule should preclude the inclusion of such recoveries in Home Mutu-

al's taxable income for the years 1963 through 1975.

Although the Tax Court declined to label the basis for its holding as the "tax benefit rule," per se, it appears to me from the Tax Court's opinion that that court was recognizing the principles underlying the tax benefit rule as being applicable to the facts of the present case.

The majority opinion, as I read it, rests in part on the basis that applying the tax benefit rule to the present case would be an extension beyond any existing authority. It appears to me that the present situation is squarely of the type that calls for the application of the rule.

In sum, inasmuch as the taxpayer realized no real economic gain from its payment of the claims made against its policies, and it received no tax benefit from the excess accruals for unpaid losses made prior to 1963, it should not be subjected to tax on its subsequent recovery of these excess accruals. This is the essence of the long standing "tax benefit rule." *Dobson v. Commissioner*, 320 U.S. 489, 64 S.Ct. 239, 88 L.Ed. 248 (1943).

Because of the result I would reach in this case, it is not necessary for me to reach the cash subrogation recoveries issue. If I were to do so I would join in the remand provided for in Part II of the majority opinion with the exception that I find persuasive the reasoning in *American Financial Corp. v. Commissioner*, 72 T.C. 506 (1979). I concur in Part III of the majority opinion.

EN BANC OPINION ON REHEARING

Before FAIRCHILD, Chief Judge, and SWYGERT, CUMMINGS, PELL, SPRECHER, BAUER, WOOD and CUDAHY, Circuit Judges.*

PER CURIAM.

■ The sole issue before the full Court is whether a majority of the panel properly

---

**45.** *See also* Notes of Advisory Committee on Appellate Rules, Rule 39, subdivision (b); 28 U.S.C. § 2412.

* Circuit Judge Tone, who wrote the panel opinion, resigned from the Court effective April 30, 1980.

held that the tax benefit rule [1] may not be invoked unless the items sought to be excluded from taxation are asserted to be taxable only by means of the exclusionary aspect of the tax benefit rule. For the reasons given in the majority panel opinion, we hold the tax benefit rule requires use of the inclusionary aspect of the rule before a taxpayer can employ the exclusionary aspect. *Supra* at pp. 343–346.

At the *en banc* oral argument, in a colloquy between bench and bar, counsel suggested that Sections 832(b)(5) and 821(e) of the Internal Revenue Code as interpreted and applied in this case, while ostensibly taxing income, in fact operate to impose a direct tax on property that is not apportioned according to population, in violation of Article I, Section 2, Clause 3 and Section 9, Clause 4 of the Constitution.[2] A tax on income, of course, need not be apportioned in view of the Sixteenth Amendment.[3] This argument appears to be found-

ed on a confusion of "taxable income" with "income." As then Judge Tone's majority opinion stated in its discussion of the tax benefit rule, this is not a case in which the Commissioner has added a "recovery" or recaptured loss to taxpayer's gross income. The bottom line effect of the relevant provisions here has been to reduce the amount of the "losses incurred" deduction allowable to taxpayer in 1966 and 1971, thereby increasing the amount of its taxable income for those years. *Supra* at p. 346.

Taxable income is simply that portion of taxpayer's gross income that Congress has chosen to tax. The term "taxable" in no way connotes a constitutional limitation on the extent to which or the manner in which gross income may be taxed. To the contrary, it is well settled that Congress has the power to impose without apportionment an income or excise tax measured by gross income or gross receipts, even where an individual taxpayer

---

1. In *Putoma Corp. v. Commissioner*, 66 T.C. 652, 664 n. 10, affirmed, 601 F.2d 734 (5th Cir. 1979), the Tax Court described the tax benefit rule as follows:

    "both a rule of inclusion and exclusion; recovery of an item previously deducted must be *included* in income; that portion of the recovery not resulting in a prior tax benefit is *excluded*."

    As explained in the panel majority opinion in the present case, the tax benefit rule is not limited to the recoveries of deductions but also includes recoveries of items that had earlier resulted in tax credits and of funds, such as embezzled monies, that were never included in gross income. *Supra* at p. 343 n. 26.

2. Section 2, Clause 3 provides in pertinent part:

    "Representatives and direct Taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers * * *."

    Section 9, Clause 4 provides:

    "No Capitation, or other direct, Tax shall be laid, unless in Proportion to the Census or Enumeration herein before directed to be taken."

3. The Sixteenth Amendment provides:

    "The Congress shall have power to lay and collect taxes on incomes, from whatever source derived, without apportionment among the several States, and without regard to any census or enumeration."

This amendment was added to the Constitution in response to the Supreme Court's invalidation of the Income Tax Act of 1894 in *Pollock v. Farmer's Loan & Trust Co.*, 157 U.S. 429, 601, 15 S.Ct. 673, 39 L.Ed. 759 (initial decision), 158 U.S. 601, 15 S.Ct. 912, 39 L.Ed. 1108 (decision on rehearing), on the ground that a tax on income derived from property was the equivalent of a direct tax on the income–producing property itself and therefore must be apportioned in accordance with the above–quoted provisions of Article I. Prior to the decision in *Pollock*, it had been the general consensus that the term "direct taxes" as used in the Constitution referred only to taxes on real estate and poll or capitation taxes. See, *e. g., Hylton v. United States*, 3 U.S. (3 Dall.) 171, 177, 1 L.Ed. 556; *Veazie Bank v. Fenno*, 75 U.S. (8 Wall.) 533, 544, 19 L.Ed. 482; *Springer v. United States*, 102 U.S. 586, 602, 26 L.Ed. 253. In 1937, the Supreme Court effectively overruled *Pollock*, see *New York ex rel. Cohn v. Graves*, 300 U.S. 308, 57 S.Ct. 466, thereby making the Sixteenth Amendment superfluous, Congress' power to lay and collect income taxes does not, of course, derive from the Sixteenth Amendment, but from Article I, Section 8, Clause 1 of the Constitution, which provides in pertinent part:

"The Congress shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and General Welfare of the United States * * *."

has no net income after expenses, *Penn Mutual Indemnity Co. v. Commissioner of Internal Revenue*, 277 F.2d 16, 20 (3d Cir. 1960), and that deductions are generally a matter of legislative grace. *Idem.* Indeed, mutual insurance companies like taxpayer here were, as has already been noted in the panel majority opinion, prior to 1963 taxed on the basis of gross income, and that very tax was upheld in *Penn Mutual Indemnity Co., supra*, against constitutional attack similar to the one raised here. Congress has now chosen to use a different measure of taxation, one which allows a deduction for "losses incurred," but "losses incurred" only as defined and computed under the Code. This choice was a matter of legislative discretion and is not rendered constitutionally infirm for lack of apportionment because the resulting tax is not confined to or measured by taxpayer's actual net income.

The Tax Court's resolution of the unpaid losses dispute is reversed, with costs to the Commissioner.

CUDAHY, Circuit Judge, concurring:

I agree with the majority of the full Court and of the panel that the decided cases, with the possible exception of *American Financial Corp. v. Commissioner*, 72 T.C. 506 (1979), appear to employ the exclusionary aspect of the tax benefit rule only when the items sought to be excluded are asserted to be taxable by means of the inclusionary aspect. This is not in my view the case in which to introduce "flexibility" in a whole new dimension into the tax benefit rule. *Cf. First Trust & Savings Bank of Taylorville v. United States*, 614 F.2d 1142, 1145 (7th Cir. 1980). When such a case may be presented, however, I do not believe that the existing precedents necessarily constitute a complete bar to extension of the rule in some fashion as an exclusionary mechanism only.

FAIRCHILD, Chief Judge, with whom PELL and BAUER, Circuit Judges, join, dissenting in part and concurring in part.

I respectfully dissent as to the unpaid losses dispute.

In any tax year after 1962, an estimate of a loss incurred in that year, but not settled, measures a deduction from underwriting income. In a later year, if that loss is settled for less than the estimate, the statute causes the difference to augment underwriting income. In these instances, the statute itself is consistent with the inclusionary aspect of the tax benefit rule. Our problem arises because the present statutory taxing system began at the close of 1962, and the statute makes no allowance for the fact that an estimate of a loss incurred in 1962 or before, but not settled, may in fact be larger than necessary. When such a claim is settled after 1962 for less than the estimate, the statute causes income to be increased by the amount of the difference. The same thing happens where a post–1962 loss is settled in a later year for less than the estimate, but in the latter case the taxpayer has previously been able to deduct the full amount of the estimate in a previous year. Not so with the pre–1963 loss.

Clearly enough Congress has power to treat the post–1962 loss in the manner it has.

The settlement after 1962 of the pre–1963 loss presents a different question. Read mechanically, the statute treats the amount by which the company overestimated the pre–1963 claim as taxable income in the post–1962 year in which the claim is settled; the company's tax is increased solely by reason of the fact that it paid a claim against its policies. This, however, is inappropriate, for the Sixteenth Amendment permits only the taxation of income, yet here the settlement produced none. When an unliquidated debt is discharged by an amount less than anticipated there is no gain or profit to the debtor, it receives nothing of value and is released from satisfying no obligation it was otherwise bound to perform.[1]

1. Of course the taxpayer is better off than it would have been had the claim been settled for

a higher amount. The point, however, is that because it was never obliged to pay a higher

It seems to me that faced with a constitutional question, we are to look for constructions of the statute which might save it.[2]

A possible argument is that by taxing a mutual casualty insurance company's "recovery" of the amount by which it overestimated a pre-1963 claim, Congress is merely attempting to levy a tax on part of the company's previous income which under pre-1963 law escaped taxation. There is no dispute that, subject to certain limitations concerning harshness or arbitrariness of impact, Congress has the power to retroactively tax income, see e. g., Lynch v. Hornby, 247 U.S. 339, 343, 38 S.Ct. 543, 544, 62 L.Ed. 1149 (1918); Brushaber v. Union Pacific Railroad, 240 U.S. 1, 36 S.Ct. 236, 60 L.Ed. 493 (1916), but a statute will not be construed to do so in the absence of a "clear, strong, and imperative" declaration that such was the intent of Congress. Shwab v. Doyle, 258 U.S. 529, 535, 42 S.Ct. 391, 392, 66 L.Ed. 747 (1922), quoting United States v. Heth, 7 U.S. 399, 3 Cranch 398, 413, 2 L.Ed. 479 (1806); see also Rose v. Commissioner, 55 T.C. 28 (1970). In the present case, quite simply, there is nothing expressed in the text of the relevant statute or in its legislative history capable of satisfying this requirement, and intent may not be inferred from the language of the Act.[3]

Clearly Congress intended to enact a valid statute, and it seems far more likely that Congress, in designing a system consistent with the tax benefit rule, permitting the deduction of the estimated amount of a loss incurred after the effective date of the statute, but including in income in a later year the difference between the estimate and the lower amount of a settlement, intended that the principle of the tax benefit rule apply as well to an advantageous settlement after the effective date of the statute of a loss previously incurred.

Accordingly, I would affirm the Tax Court on this issue. I concur in Part III of the majority panel opinion.

PELL, Circuit Judge, dissenting in part, concurring in part.

While continuing to adhere to the views expressed in my dissent—concurrence to the opinion of Judge Tone, I also concur and join in the dissent—concurrence of Chief Judge Fairchild filed in the present en banc proceedings.

With all due respect to the majority per curiam opinion, it appears to me that it indulges in semantic unreality to avoid recognizing that in fact this taxpayer is being required to treat as taxable income a recovery from which it never had any tax benefit.

---

figure, no benefit derived from the fact that the settlement cost less than estimated. The situation here is unlike the partial cancellation of liquidated debt, which usually results in a taxable income, for in the latter case the debtor is released from paying an amount he otherwise would be bound to pay. See generally, 3 Rabkin & Johnson § 36.01.

2. Home Mutual contended, both in its petition for reargument and at oral argument before the court sitting en banc, that the relevant provisions of the statute as applied by the Commissioner should be held unconstitutional, but that this result could be avoided by invoking the exclusionary aspect of the tax benefit rule.

3. It is not sufficient that an intent to levy a retroactive tax might reasonably be suggested by the terms of the statute. In Shwab, supra, the court found that the Act there in question "provided that . . . a tax was to be imposed upon the transfer of the net estate of every decedent dying after the passage of the act, 'to

the extent of any . . . transfer [made] . . . in contemplation of . . . death . . .'" and that transfers made within two years of death without receipt of fair consideration were rebuttably presumed to have been made for such a purpose. 258 U.S. at 532, 42 S.Ct. at 391 (emphasis added). The court nonetheless held that the Act should not be construed to apply to transactions completed before the Act became law and therefore held that the value of a trust created fifteen and a half months before passage of the Act was not taxable to the decedent's estate. It reasoned that "a statute should not be given a retrospective operation unless its words make that imperative and this [could not] be said of the words of the Act" then before the court. 258 U.S. at 537.

Thus, in the present case, an intent on the part of Congress to retrospectively tax income should not be inferred from the language of the statute even though literal adherence to its terms might suggest such an intent.